**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JOE GALLEGOS and LISA GALLEGOS,

      Plaintiffs,

vs.                                                                         No. CIV 21-0486 JB/GJF

CITIMORTGAGE, INC.; CENLAR FSB;
SECRETARY OF HOUSING AND URBAN
DEVELOPMENT; EQUIFAX
INFORMATION SERVICES, LLC;
EXPERIAN INFORMATION SOLUTIONS,
INC. and TRANS UNION, LLC,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) Defendants Equifax Information Services

LCC, Experian Information Solutions Inc., and Trans Union LLC's Motion to Dismiss Plaintiffs'

Complaint and Supporting Memorandum of Law, filed October 28, 2021 (Doc. 62)("MTD");

(ii) Defendant CitiMortgage, Inc's and Cenlar FSB's Motion for Abatement and Brief in Support,

filed December 3, 2021 (Doc. 78)("MFA"); and (iii) Defendants CitiMortgage, Inc.'s and Cenlar

FSB's Opposed Motion for Leave to File Counterclaim, filed December 15, 2021 (Doc.

82)("Counterclaim Motion").  The Court held a hearing on the MTD on December 20, 2021.  See

Clerk's Minutes, filed December 20, 2021 (Doc. 98).  The Court held a hearing on the MFA and

the Counterclaim Motion on January 5, 2022.  See Amended Clerk's Minutes, filed January 5,

2022 (Doc. 127).  The primary issues are: (i) whether the Court should dismiss in its entirety the

Second Amended Complaint, filed September 3, 2021 (Doc. 20)("Complaint"), because Plaintiffs

Joe Gallegos and Lisa Gallegos do not plead adequately a factual inaccuracy in their credit file to

support a claim under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681e(b) and 1681i(a)

("FCRA"); (ii) whether the Court should order J. Gallegos and L. Gallegos to withdraw their CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195, Homeowners' Motion for Sanctions in State court, because ordering withdrawal is necessary to protect the Court's jurisdiction; (iii) whether Defendants CitiMortgage, Inc. and Cenlar FSB may assert a counterclaim against J. Gallegos and L. Gallegos for an equitable lien on the contested real property and for unjust enrichment.  The Court concludes that: (i) it will not dismiss J. Gallegos and L. Gallegos' Complaint in its entirety and that it will not dismiss J. Gallegos and L. Gallegos' FCRA claim, because, as pled, J. Gallegos and L. Gallegos allege that Equifax Information, Experian Information, and Trans Union incorrectly reported debt owed to CitiMortgage, Inc. or Cenlar FSB; (ii) it will not order J. Gallegos and L. Gallegos to withdraw their State court sanctions motion, because the All Writs Act, 28 U.S.C. § 1651, does not give the Court exclusive jurisdiction over all disputes arising out of a certain set of facts, because the Anti-Injunction Act, 28 U.S.C. § 2283, precludes the Court from ordering J. Gallegos and L. Gallegos to withdraw their State court sanctions motion; and (iii) CitiMortgage, Inc., and Cenlar FSB may assert an unjust enrichment counterclaim against J. Gallegos and L. Gallegos, but may not assert a counterclaim for an equitable lien on the contested real property, because it would be futile under rule 15 of the Federal Rules of Civil Procedure.  Accordingly, the Court will: (i) deny the MTD; (ii) deny the MFA; and (iii) deny the Counterclaim Motion in part and grant the Counterclaim Motion in part.

## FACTUAL BACKGROUND

The Court sets forth two sets of facts.  The first set of facts are for the MTD's purposes, so the Court takes its facts from the Complaint.  See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  For the MTD facts, the Court "accepts as true all factual allegations asserted in the complaint."  Al-Owhali v. Holder,

867 F.3d 1236, 1240 (10th Cir. 2012). The second set of facts are for the MFA and the Counterclaim Motion. For the second set of facts, the Court takes its facts from the Complaint, the MFA, the Counterclaim Motion, the Plaintiffs' Response in Opposition to Defendant CitiMortgage, Inc.'s and Cenlar FSB's Motion for Abatement, filed December 17, 2021 (Doc. 87)("MFA Response"), the December 20, 2021, hearing, and the January 5, 2022, hearing.

      1.      **<u>Facts for the MTD</u>.**

      Around 2000, J. Gallegos and L. Gallegos took out a loan with Old Republic Mortgage. <u>See</u> Complaint ¶ 14, at 3. In 2018, CitiMortgage, Inc. sued J. Gallegos and L. Gallegos in State court for foreclosure, arguing that it is entitled to collect the loan. <u>See</u> Complaint ¶ 14, at 3. On August 9, 2019, the Honorable Beatrice Brickhouse, District Court Judge for the County of Bernalillo, Second Judicial District Court, State of New Mexico, granted summary judgment in J. Gallegos and L. Gallegos' favor, concluding that, as a matter of law, CitiMortgage, Inc. does not have the right to collect on the note that the mortgage secures. <u>See</u> Complaint ¶ 15, at 3. Judge Brickhouse concluded that CitiMortgage, Inc. is not entitled to enforce the mortgage, because CitiMortgage, Inc. was not in possession of the original Promissory Note when a prior holder lost it. <u>See</u> Complaint ¶ 15, at 3. CitiMortgage, Inc. did not appeal Judge Brickhouse's decision. <u>See</u> Complaint ¶ 16, at 3.

      Both before and after Judge Brickhouse's August 9, 2019, ruling, CitiMortgage, Inc. contract with Cenlar FSB to service J. Gallegos and L. Gallegos' mortgage. <u>See</u> Complaint ¶ 17, at 4. Since Judge Brickhouse's August 9, 2019, ruling, CitiMortgage, Inc. and Cenlar FSB continue to send J. Gallegos and L. Gallegos "bills, letters, and other documents falsely representing that" J. Gallegos and L. Gallegos owed CitiMortgage, Inc. money. Complaint ¶ 18, at 4. On April 1, 2020, Cenlar FSB sent a letter to J. Gallegos and L. Gallegos that states: "'We

are sending you this notice to you because you are behind on your mortgage payments.  We want to notify you of possible ways to avoid losing your home.  We have a right to invoke foreclosure based on the terms of your mortgage contract,'" Complaint ¶ 19, at 4 (quoting Letter from Cenlar FSB to J. Gallegos and L. Gallegos at 1, dated April 1, 2020, filed September 3, 2021 (Doc. 20-2)).  On December 31, 2019, Cenlar FSB sent a letter to J. Gallegos and L. Gallegos listing a "'payoff amount'" of $125,976.82.  Complaint ¶ 19, at 4 (quoting Annual Disclosure Letter to Mortgagor at 4, dated December 31, 2019, filed September 3, 2021 (Doc. 20-2)).  A February 20, 2020, letter states that J. Gallegos and L. Gallegos owe $645.36 to Cenlar FSB per month.  See Complaint ¶ 19, at 4 (citing Annual Escrow Account Disclosure Statement at 6, dated February 20, 2020, filed September 3, 2021 (Doc. 20-2)).  A bill sent to J. Gallegos and L. Gallegos, dated October 1, 2020, states a "'past due amount'" of $44,069.00, and asserts that "'You are late on your mortgage payments.  Failure to bring your loan current may result in fees and foreclosure -- the loss of your home.'"  Complaint ¶ 19, at 4 (quoting Loan Statement at 9, dated October 1, 2020, filed September 3, 2021 (Doc. 20-2)).

After Judge Brickhouse's August 9, 2019, ruling, CitiMortgage, Inc. and Cenlar FSB continued to send a property inspector to J. Gallegos and L. Gallegos' home every month.  See Complaint ¶ 20, at 4.  This practice is "employed by mortgage companies to determine whether a homeowner continues to occupy a home that is in foreclosure."  Complaint ¶ 20, at 4.  CitiMortgage, Inc. and Cenlar FSB "routinely trespassed" on J. Gallegos and L. Gallegos' property, "peered into their home windows, attempted to open their gate, lurked in the street in front of the home and conspicuously took photographs of the home."  Complaint ¶ 21, at 5.  Through CitiMortgage, Inc. and Cenlar FSB's counsel, J. Gallegos and L. Gallegos' attorney asked CitiMortgage, Inc. and Cenlar FSB to stop inspecting J. and L. Gallegos' property, but the monthly

inspections continued for nearly two years.  See Complaint ¶ 22, at 5.  The monthly property inspections "upset, embarrassed and confused" J. Gallegos and L. Gallegos.  Complaint ¶ 23, at 5.

As a result of CitiMortgage, Inc.'s refusal to release its mortgage on the home, J. Gallegos and L. Gallegos have not been able to purchase a homeowner's insurance policy for the home.  See Complaint ¶ 24, at 5.  CitiMortgage, Inc., and Cenlar FSB report "negative and inaccurate information" to J. Gallegos and L. Gallegos' credit reports, which damages J. Gallegos and L. Gallegos' credit.  Complaint ¶ 25, at 5.  CitiMortgage, Inc. and Cenlar FSB's "inaccurate negative reporting to the Gallegos' credit reports caused them to be denied credit in August 2021."  Complaint ¶ 26, at 5.  In January, 2021, the six-year statute of limitations "ran on collection of the Gallegos' mortgage debt, which they defaulted on in January 2015."  Complaint ¶ 27, at 5.

On or about June 25, 2021, J. Gallegos and L. Gallegos sent "dispute letters" to Equifax Information, Experian Information, and Trans Union, which dispute CitiMortgage, Inc. and Cenlar FBS's right to enforce or report the debt, as well as dispute "the negative and false reporting that the Gallegos were behind on their mortgage payments" and asked Equifax Information, Experian Information, and Trans Union to conduct another investigation pursuant to 16 U.S.C. § 1681i(a).  Complaint ¶ 30, at 5-6.  Equifax Information, Experian Information, and Trans Union alerted CitiMortgage, Inc. and Cenlar FSB to J. Gallegos and L. Gallegos' disputes.  See Complaint ¶ 32, at 6.  CitiMortgage, Inc. indicated to Equifax Information and Trans Union that it has "the right to report on the account and that" J. and L. Gallegos have not paid their mortgage.  Complaint ¶ 33, at 6.  "With regard to the Gallegos' Experian credit report, CitiMortgage deleted its trade line."[1]

---

[1]A trade line is "a record of activity for any type of credit extended to a borrower and reported to a credit reporting agency. A trade line is established on a borrower's credit report when a borrower is approved for credit. The trade line records all of the activity associated with an account." Trade Line, Investopedia, https://www.investopedia.com/terms/t/trade-line.asp#:~:text=What%20Is%20a%20Trade%20Line%3F%20A%20trade%20line,report%20wh

Complaint ¶ 33, at 6.  Cenlar FSB indicated to Equifax Information, Experian Information, and Trans Union that it has "the right to report the account and that the Gallegos had not paid their mortgage."  Complaint ¶ 34, at 6.

Equifax Information, Experian Information, and Trans Union responded to the disputes in July, 2021.  See Complaint ¶ 35, at 6.  Equifax, Info. and Trans Union continued to report the inaccurate information that CitiMortgage, Inc. and Cenlar FSB had provided.  See Complaint ¶ 35, at 6.  Experian stopped reporting CitiMortgage, Inc.'s account.  See Complaint ¶ 35, at 6.  In August, 2021, J. Gallegos and L. Gallegos applied for a loan so they could buy a car and other household items, but were denied.  See Complaint ¶ 36, at 6.  CitiMortgage, Inc., Cenlar FSB, Equifax Information, Experian, Information, and Trans Union, did not conduct another investigation.  See Complaint ¶ 37, at 6.

### 2.      Facts for the MFA and Counterclaim Motion.

In 2018, CitiMortgage filed suit in New Mexico State court seeking foreclosure of J. Gallegos and L. Gallegos' home.  See MFA Response at 1.  On August 19, 2019, Judge Brickhouse granted summary judgment in J. Gallegos and L. Gallegos' favor, stating that CitiMortgage, Inc. is "not a party entitled to enforce" the promissory note that J. Gallegos had signed, because CitiMortgage, Inc. "was not in possession of the Note at the time the Note was lost."  Order Granting Defendant's Motion for Summary Judgment at 1, filed September 3, 2021 (Doc. 20-1)("Brickhouse Order").  A prior holder of the promissory note lost it before CitiMortgage, Inc.

---

en%20a%20borrower%20is%20approved%20for%20credit (last visited March 1, 2022).  Credit reporting agencies use trade lines "to calculate a borrower's credit score.  Different credit reporting agencies give differing weights to the activities of trade lines when establishing a credit score for borrowers."      Trade    Line,    Investopedia,    https://www.investopedia.com/terms/t/trade-line.asp#:~:text=What%20Is%20a%20Trade%20Line%3F%20A%20trade%20line,report%20wh en%20a%20borrower%20is%20approved%20for%20credit (last visited March 1, 2022).

bought J. Gallegos and L. Gallegos' loan.  See Brickhouse Order at 1.  CitiMortgage, Inc. never possessed the original promissory note.  See Brickhouse Order at 1.

After the State suit was dismissed, CitiMortgage, Inc. and Cenlar FSB, its servicer, continued to try to collect on the promissory note, and J. Gallegos and L. Gallegos' mortgage.  See MFA Response at 1.  In 2021, J. Gallegos and L. Gallegos sued in State court "for violations of the New Mexico Unfair Practices Act[2] ["NMUPA"], the Federal Debt Collection Practices Act[3] ["FDCPA"], and the Federal Fair Credit Reporting Act, as well as for quiet title and tortious debt collection."  MFA Response at 2.  CitiMortgage, Inc. and Cenlar FSB removed the case to the United States District Court for the District of New Mexico.  See MFA Response at 2.  J. Gallegos and L. Gallegos filed a Motion for Preliminary Injunction, filed August 25, 2021 (Doc. 17)("PI Motion"), asking the Court to order CitiMortgage and Cenlar FSB to cease continuing to observe, inspect, photograph, and send bills to J. and L. Gallegos.  See PI Motion at 1-9, filed August 25, 2021 (Doc. 17).  On September 27, 2021, the Court ordered CitiMortgage, Inc. and Cenlar FSB not to conduct any inspections of J. Gallegos and L. Gallegos' house, not to trespass or attempt to trespass on J. Gallegos and L. Gallegos' land, not to photograph or take video of J. Gallegos and L. Gallegos' house, and to direct any statements to J. Gallegos and L. Gallegos' attorney.  See Order, filed September 27, 2021 (Doc. 40).

In compliance with the Order, CitiMortgage, Inc. directed its statements to J. Gallegos and L. Gallegos' attorney.  See MFA at 2-3.  In response, J. Gallegos and L. Gallegos' filed a separate motion for order to show cause in the 2018 State court foreclosure case, asking the State court to

---

[2]N.M.S.A. § 57-12-3.

[3]15 U.S.C. § 1692(a).

find CitiMortgage, Inc. in "contempt of court for its failure to comply with" the Brickhouse Order. MFA Response at 2. See CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195, Homeowners' Motion for Sanctions.  In response, CitiMortgage, Inc. argue that the show cause motion is moot, because CitiMortgage, Inc. has ceased all inspection activities.  See MFA Response at 2.  J. Gallegos and L. Gallegos ask the State court to sanction CitiMortgage, Inc. for stating falsely that it has ceased its servicing activities.  See MFA Response at 2.  J. Gallegos and L. Gallegos did not alert the State court of the Court's September 27, 2021, Order, which states that CitiMortgage, Inc. and Cenlar FSB "shall direct any statements to the Plaintiff's counsel." Order at 1.

## PROCEDURAL BACKGROUND

J. Gallegos and L. Gallegos sued CitiMortgage, Inc. and Cenlar FSB in State court on May 11, 2021.  See Complaint for Damages and Quiet Title at 2, filed May 27, 2021 (Doc. 1-2). CitiMortgage, Inc. and Cenlar FSB removed this case to the United States District Court for the District of New Mexico on May 27, 2021.  See Notice of Removal at 1, filed May 27, 2021 (Doc. 1).  On September 3, 2021, J. Gallegos and L. Gallegos filed their Second Amended Complaint against CitiMortgage, Inc. and Cenlar FSB, the Secretary of Housing and Urban Development, Equifax Information, Experian Information, and Trans Union.  See Complaint at 1.  J. Gallegos and L. Gallegos assert six claims: (i) quiet title, seeking a declaration that J. Gallegos and L. Gallegos' mortgage is released to J. Gallegos and L. Gallegos, "subject only to the existing valid mortgage lien held by the Secretary of Housing and Urban Development"; (ii) violations of the NMUPA; (iii) a violation of the FDCPA, against Cenlar FSB; (iv) tortious debt collection against CitiMortgage, Inc. and Cenlar FSB; (v) violations of the FCRA by Equifax Information, Experian

Information, and Trans Union; and (vi) FCRA violations by CitiMortgage, Inc. and Cenlar FSB. See Complaint ¶¶ 42-67, at 7-11.

On August 25, 2021, J. Gallegos and L. Gallegos filed their PI Motion, asking the Court to prohibit CitiMortgage, Inc. and Cenlar FSB from "conducting unlawful inspections and property preservation activity at Plaintiff's home," because CitiMortgage, Inc. and Cenlar FSB are "legally prohibited from collecting the Gallegos' mortgage debt," but "will stop at nothing to continue to try to collect it, and they continue to harass" J. Gallegos and L. Gallegos with "property inspections, photograph of their home and collection letters." PI Motion at 1. The Court held a hearing on the PI Motion on September 27, 2021. See Clerk's Minutes, filed September 27, 2021 (Doc. 43). At the hearing the parties agreed that CitiMortgage, Inc. and Cenlar FSB would cease inspections and would "direct any statements to the Plaintiffs' counsel." Order at 1.

### 1.    **The MTD.**

On October 28, 2021, Equifax Information, Experian Information, and Trans Union moved to dismiss the Gallegos' Complaint. See MTD at 1. Equifax Information, Experian Information, and Trans Union contend that, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court should dismiss the Complaint in its entirety. See MTD at 4. In their MTD, Equifax Information, Experian Information, and Trans Union assert that J. Gallegos and L. Gallegos plead only a legal question and not a factual issue, so their Complaint does not plead plausibly a claim upon which relief can be granted. See MTD at 3.

According to Equifax Information, Experian Information, and Trans Union, the "existence of an inaccuracy is a necessary element of both of" J. Gallegos and L. Gallegos' FCRA claims.[4]

---

[4]In the Complaint, J. Gallegos and L. Gallegos state that "Defendant Secretary of Housing and Urban Development is the holder of a valid mortgage on the Plaintiffs' home and is named as

MTA at 4.  First, Equifax Information, Experian Information, and Trans Union contend that a cause of action under 15 U.S.C. § 1681e(b) requires a plaintiff to prove that: (i) the consumer reporting agency ("CRA") published an inaccurate consumer report to a third party; (ii) the CRA failed to follow reasonable procedures to ensure its reports' maximum possible accuracy; and (iii) the CRA's failure to follow reasonable procedures caused actual damages to the plaintiff.  See MFA at 4 (citing Collins v. Diversified Consultants, Inc., 754 F. App'x 714, 720-21 (10th Cir. 2018)(unpublished)[5]).  Second, Equifax Information, Experian Information, and Trans Union contend that a cause of action under 15 U.S.C. §1681i requires a plaintiff to prove that: (i) the plaintiff's consumer files contain inaccurate or incomplete information; (ii) the plaintiff notified the CRAs of the alleged inaccuracy; (iii) the dispute is not frivolous or irrelevant; (iv) the CRA failed to respond or to reinvestigate reasonably the disputed item(s); and (v) the CRAs damaged the plaintiff.  See MTD at 4 (citing Collins v. Diversified Consultants, Inc., 754 F. App'x at 720-

---

a Defendant in this case solely for purpose of notice of the quiet title action."  Complaint ¶ 10, at 2.

[5]Collins v. Diversified Consultants, Inc. is an unpublished opinion, but the Court can rely on an Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Collins v. Diversified Consultants, Inc., Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(unpublished), and Pinson v. Equifax Credit Info. Servs., 316 F. App'x 744, 751 (10th Cir. 2009)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

71).  According to Equifax Information, Experian Information, and Trans Union, "the existence of

an inaccuracy is a necessary element of Plaintiff's FCRA claims."  MTD at 4 (citing <u>Wright v.

Experian Info Solutions, Inc.</u>, 805 F.3d 1232, 1242 (10th Cir. 2015)).

Equifax Information, Experian Information, and Trans Union argue that J. Gallegos and L.

Gallegos' contention that Equifax Information, Experian Information, and Trans Union reported

inaccurate information based on their legal interpretation of the Court's Order "and its impact on

ongoing credit reporting."  MTD at 5.  Equifax Information, Experian Information, and Trans

Union allege that, in other words, J. Gallegos and L. Gallegos' claim is not that Equifax

Information, Experian Information, and Trans Union "reported any incorrect _factual_ information

about their mortgage," but that Equifax Information, Experian Information, and Trans Union

"failed to adopt" J. Gallegos and L. Gallegos' "interpretation of the Order" and their "legal position

as to the reporting of the Accounts on their credit files."  MTD at 5 (emphasis in original).

According to Equifax Information, Experian Information, and Trans Union, J. Gallegos and L.

Gallegos' FCRA claim is "meritless," because CRAs are "not required to adjudicate legal issues"

and because it is "well settled that only factual inaccuracies, not legal issues, can give rise to"

FCRA liability.  MTD at 5.

Equifax Information, Experian Information, and Trans Union rely on the United States

Court of Appeals for the First Circuit's decision in <u>DeAndrade v. Trans Union LLC</u>, 523 F.3d 61

(1st Cir. 2018).  <u>See</u> MTD at 6.  Equifax Information, Experian Information, and Trans Union

assert that <u>DeAndrade v. Trans Union LLC</u>, 523 F.3d at 63, stands for the proposition that, "if a

plaintiff cannot identify information that is factually inaccurate and, instead, claims that the

information should not have been reported due to a legal dispute with the creditor, a CRA does not

have a duty to resolve such a dispute."  MTD at 7.  Equifax Information, Experian Information,

and Trans Union argue that the Court should adopt the First Circuit's reasoning, and conclude that J. Gallegos and L. Gallegos do not state a claim upon which relief can be granted, because they "attack the continued reporting of the Accounts due to their own, unilateral interpretation of the Order." MTD at 7. Equifax Information, Experian Information, and Trans Union, therefore, urge the Court to dismiss with prejudice J. Gallegos and L. Gallegos' Complaint in its entirety. See MTD at 8.

       2.    **The MTD Response**.

       J. Gallegos and L. Gallegos respond to Equifax Information, Experian Information, and Trans Union's MTD. See Response in Opposition to Equifax, Experian and Trans Union's Join Motion to Dismiss, filed November 18, 2021 (Doc. 71)("MTD Response"). J. Gallegos and L. Gallegos contend that their Complaint plausibly pleads a claim upon which relief can be granted, and that the Court should not dismiss their Complaint. See MTD Response at 3. J. Gallegos and L. Gallegos contend that when confronted with the Brickhouse Order, Equifax Information, Experian Information, and Trans Union had "the duty to investigate and delete Citi's and Cenlar's inaccurate reporting." MTD Response at 2. According to J. Gallegos and L. Gallegos, Equifax Information, Experian Information, and Trans Union's argument that there is no factual dispute is incorrect, because J. Gallegos and L. Gallegos "had already presented" Equifax Information, Experian Information, and Trans Union with "the Order resolving the validity of the Citi and Cenlar mortgage debt in favor of" J. Gallegos and L. Gallegos, meaning that CitiMortgage, Inc. and Cenlar FSB's "negative reporting of this debt *was* factual inaccuracy on the Gallegos' credit reports." MTD Response at 4.

       To support their contention, J. Gallegos and L. Gallegos make two arguments. See MTD Response at 3-10. First, J. Gallegos and L. Gallegos argue that the Brickhouse Order means that

CitiMortgage, Inc. and Cenlar FSB's negative reporting was a factual inaccuracy that Equifax Information, Experian Information, and Trans Union failed to reinvestigate.  <u>See</u> MTD Response at 5.  Second, J. Gallegos and L. Gallegos assert that the Tenth Circuit concludes that, where a court resolve the legal validity of a debt, CRAs have a duty to investigate.  <u>See</u> MTD Response at 7.

### 3.     <u>The MTD Reply</u>.

Equifax Information, Experian Information, and Trans Union reply to the MFA Response.  <u>See</u> Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union LLC's Reply in Support of Motion to Dismiss Plaintiff's Complaint, filed December 9, 2021 (Doc. 79)("MTD Reply").  Equifax Information, Experian Information, and Trans Union maintain that the Court should dismiss the Complaint in its entirety.  <u>See</u> MTD Reply at 1-8.  In the MTD Reply, Equifax Information, Experian Information, and Trans Union make three arguments.

First, Equifax Information, Experian Information, and Trans Union assert that "there is nothing clear about" the Brickhouse Order.  MTD Reply at 1.  Equifax Information, Experian Information, and Trans Union allege that J. Gallegos and L. Gallegos' argument hinges on assuming that the Brickhouse Order states something clearly and unambiguously about credit reporting, or anything else other than whether CitiMortgage, Inc. is entitled to enforce the promissory note.  MTD Reply at 1.  Equifax Information, Experian Information, and Trans Union assert that the Brickhouse Order is unclear, meaning that its "lack of clarity presented a legal question" and not a "factual inaccuracy."  MTD Reply at 2.

Second, Equifax Information, Experian Information, and Trans Union contend that they are not required to adopt J. Gallegos and L. Gallegos' interpretation of the Brickhouse Order.  <u>See</u> MTD Reply at 2.  According to Equifax Information, Experian Information, and Trans Union, J.

Gallegos and L. Gallegos believe that the Brickhouse Order's existence "resolves any ambiguity regarding the existence of the debt" even though the Brickhouse Order is "entirely silent regarding any ongoing implications regarding the outstanding debt." MTD Reply at 3. Equifax Information, Experian Information, and Trans Union allege that J. Gallegos and L. Gallegos "base their entire claims on their own, unilateral interpretation" of the Brickhouse Order. MTD Reply at 3. Equifax Information, Experian Information, and Trans Union argue that the law does not require them to "research, understand, [or] interpret" the Brickhouse Order, or "decide whether Plaintiffs' interpretation of the Order was the correct one." MTD Reply at 3.

Third, Equifax Information, Experian Information, and Trans Union argue that the Court should dismiss J. Gallegos and L. Gallegos' Complaint, because, even if the Brickhouse Order is clear, and even if CitiMortgage, Inc. and Cenlar FSB are not able to enforce the promissory note, J. Gallegos and L. Gallegos' debt is not extinguished. See MTD Reply at 3. According to Equifax Information, Experian Information, and Trans Union, even if J. Gallegos and L. Gallegos are correct that CitiMortgage, Inc. and Cenlar FSB are not able to enforce the note, "the debt was still incurred," meaning that Equifax Information, Experian Information, and Trans Union "correctly (and accurately) continued to report the outstanding debt" on J. Gallegos and L. Gallegos' credit files. MTD Reply at 3. Equifax Information, Experian Information, and Trans Union argue that Prianto v. Experian Info. Sols., Inc., No. CV 13-3461-TEH, 2014 WL 3381578 (N.D. Cal. July 10, 2014)(Henderson, J.), suggests that "an extinguishment of an ability to collect a debt does not equate to the extinguishment of the debt itself." See MTD Reply at 3. Equifax Information, Experian Information, and Trans Union attest that, if the Court concludes that, because a debt cannot be collected, it cannot be reported, would be "counter intuitive," and would mean rewarding

J. Gallegos and L. Gallegos "for defaulting on their mortgage," thus letting them escape from "the consequences of ongoing, accurate credit reporting."  MTD Reply at 4.

    **4.**    <u>**The MFA.**</u>

    CitiMortgage, Inc. and Cenlar FSB ask the Court to order J. Gallegos and L. Gallegos to withdraw their motion for sanctions in State court.  <u>See</u> MFA at 1.  CitiMortgage, Inc. and Cenlar FSB argue that the All Writs Act, gives the Court the authority to order J. Gallegos and L. Gallegos to withdraw their sanctions request.  <u>See</u> MFA at 1.  In the MFA, CitiMortgage, Inc. and Cenlar FSB make four arguments.  <u>See</u> MFA at 3-9.

    First, CitiMortgage, Inc. and Cenlar FSB assert that the All Writs Act gives the Court the authority to "preserve its jurisdiction," and that J. Gallegos and L. Gallegos' sanctions request "threaten[s] the course of the current and ongoing litigation before this Court," because "all Defendants in this lawsuit suffer a risk of being subject to two incompatible judgments."  MFA at 5.  CitiMortgage, Inc. and Cenlar FSB argue that the subject of the State court sanctions motion is also "the subject of the current lawsuit pending before this Court, and is specifically addressed by the September 27, 2021 Order."  MFA at 3-4.  According to CitiMortgage, Inc. and Cenlar FSB, J. Gallegos and L. Gallegos' sanctions motion "trespass[es] upon this Court's jurisdiction and ability to decide this case."  MFA at 4.  CitiMortgage, Inc. and Cenlar FSB assert that, once a federal court has jurisdiction, the All Writs Act "empowers the Court to preserve its jurisdiction," including "the power to prevent the frustration of orders this Court has previously issued in its exercise of jurisdiction otherwise obtained."  MFA at 4.

    Second, CitiMortgage, Inc. and Cenlar FSB argue that the State court "can no longer exercise meaningful jurisdiction over the parties' conduct," because the State court case is final.  MFA at 5.  According to CitiMortgage, Inc. and Cenlar FSB, J. Gallegos and L. Gallegos could

have "sought relief by asking for additional language to be included in" the Brickhouse Order, but instead chose to bring this lawsuit.  MFA at 5.  CitiMortgage, Inc. and Cenlar FSB assert that "this Court, and only this Court" is the "correct forum to review all matters relating to the issues" that J. Gallegos and L. Gallegos raise.  MFA at 5.

Third, CitiMortgage, Inc. and Cenlar FSB argue that J. Gallegos and L. Gallegos' State court sanctions motion will "effectively circumvent federal jurisdiction and frustrate the purpose of the removal statute."  MFA at 6.  CitiMortgage, Inc. and Cenlar FSB allege that, when they removed this case to federal court the Court "obtained plenary jurisdiction over the action."  MFA at 6.  CitiMortgage, Inc. and Cenlar FSB state that J. Gallegos and L. Gallegos' State court sanctions motion suggests that they are "unhappy with the removal," despite not attempting to remand this case to State Court.  MFA at 6.  According to CitiMortgage, Inc. and Cenlar FSB, the State court does not have jurisdiction to "review the matters pled in those motions," because the Court is the "only forum with appropriate jurisdiction to review the underlying facts of the claims raised in this litigation."  MFA at 6.  CitiMortgage, Inc. and Cenlar FSB contend that ordering J. Gallegos and L. Gallegos to withdraw their sanctions motion in State court is, "at a minimum, the appropriate remedy."  MFA at 6.

Fourth, CitiMortgage, Inc. and Cenlar FSB argue that the Court is better suited than the State court to review violations of its Order.  See MFA at 7.  CitiMortgage, Inc. and Cenlar FSB state that, by raising the issue of sending mortgage statements, J. and L. Gallegos have "brought the Court's September 27, 2021 Order into question."  MFA at 7.  CitiMortgage, Inc. and Cenlar FSB contend that J. and L. Gallegos' State court sanctions motion relies on a disregard of the "plain language of this Court's September 27, 2021 Order."  MFA at 7.  CitiMortgage, Inc. and Cenlar FSB allege that, because the Court "maintains plenary jurisdiction, litigation is active and

ongoing, and the order in question emanated from this Court," the Court is the "only appropriate forum to review" the Court's Order.  MFA at 7.  CitiMortgage, Inc. and Cenlar FSB, therefore, request that the Court order J. Gallegos and L. Gallegos to withdraw their State court sanctions motion.  See MFA at 8.

**5.      The MFA Response.**

J. Gallegos and L. Gallegos respond to the MFA.  See Plaintiff's Response in Opposition to Defendants CitiMortgage, Inc.'s and Cenlar FBS's Motion for Abatement, filed December 17, 2021 (Doc. 87)("MFA Response").  J. Gallegos and L. Gallegos make three arguments.  See MFA Response at 2-6.  First, J. Gallegos and L. Gallegos argue that the Anti-Injunction Act, 28 U.S.C. § 2283, bars the Court from granting the MFA.  See MFA Response at 3.  J. Gallegos and L. Gallegos argue that none of the Anti-Injunction Act's exceptions applies here, because there is no congressional authorization for such an order, granting the MFA is not necessary to aid the Court's jurisdiction, and granting the MFA is not necessary to effectuate any federal court judgments.  See MFA Response at 3.  Second, J. Gallegos and L. Gallegos argue that both the Court and the State court have jurisdiction over the matters before them, and that the Court has no jurisdiction to interfere with the State court proceedings.  See MFA Response at 4.  Third, J. Gallegos and L. Gallegos contend that CitiMortgage, Inc. and Cenlar FSB's MFA "simply smacks of an attempt [to] deny" J. Gallegos and L. Gallegos access to the courts.  MFA Response at 5.  J. Gallegos and L. Gallegos, therefore, request that the Court deny the MFA.  See MFA Response at 6.

**6.      The Counterclaim Motion.**

CitiMortgage, Inc. and Cenlar FSB seek leave to file a counterclaim.  See Counterclaim Motion at 1.  CitiMortgage, Inc. and Cenlar FSB want to assert a counterclaim for an equitable lien on J. Gallegos and L. Gallegos' property, as well as for monetary damages for unjust

enrichment.  See Counterclaim Motion at 2.  CitiMortgage, Inc. and Cenlar FSB state that rule 15(a)(2) of the Federal Rules of Civil Procedure indicates that parties should be granted leave freely to amend their pleadings.  See Counterclaim Motion at 1 (citing Fed. R. Civ. P. 15 (a)(2)).  Moreover, CitiMortgage, Inc. and Cenlar FSB assert that motions to file counterclaims should be liberally granted.  See Counterclaim Motion at 1 (citing Park v. Hyatt Corp., 436 F. Supp. 2d 60, 66-67 (D.C. Cir. 2006)(Roberts, J.)).

### 7.     The Counterclaim Response.

J.  Gallegos  and  L.  Gallegos  oppose  the  Counterclaim  Motion,  contending  that CitiMortgage, Inc. and Cenlar FSB should not be permitted to file a counterclaim for an equitable lien and unjust enrichment, because it would be futile.  See Plaintiff's Response in Opposition to Motion for Leave to File Counterclaim at 1, filed December 23, 2021 (Doc. 96)("Counterclaim Response").  J. Gallegos and L. Gallegos assert that the Brickhouse Order "made clear that Citi cannot collect on this lost note," so CitiMortgage, Inc. and Cenlar FBS's "proposed amendment to collect on this note is futile."  Counterclaim Response at 2.  According to J. Gallegos and L. Gallegos, the proposed counterclaim "will not withstand a motion to dismiss for failure to state a claim or a jurisdictional motion to dismiss."  Counterclaim Response at 2.  First, J. Gallegos and L. Gallegos argue that it will not withstand a motion to dismiss for failure to state a claim, because it "asks for relief that the state court has already foreclosed on, and, as such, is barred by the doctrines of collateral estoppel and res judicata."  Counterclaim Response at 2.  Second, J. Gallegos and L. Gallegos assert that the proposed counterclaim will not survive a jurisdictional motion to dismiss, because "the state court has jurisdiction over the real property at issue."  Counterclaim Response at 3.  J. Gallegos and L. Gallegos assert that CitiMortgage, Inc. and Cenlar FSB "direct their counterclaim against the same property at issue in state court," meaning that the Court "may

refuse jurisdiction of this claim pursuant to the prior exclusive jurisdiction rule."  Counterclaim Response at 3.  Finally, J. Gallegos and L. Gallegos argue that CitiMortgage, Inc. and Cenlar FSB's proposed counterclaim "smacks of an unlawful attempt at negating the state court order" and, therefore, that the Rooker-Feldman doctrine bars it.[6]  Counterclaim Response at 4-5.  J. Gallegos and L. Gallegos assert that the Rooker-Feldman doctrine bars the proposed counterclaim, because the proposed counterclaim is "a direct attack on the state court judgment that says Citi cannot enforce the note related to this property."  Counterclaim Response at 4.  J. Gallegos and L. Gallegos contend that the Court should deny the Counterclaim Motion, because CitiMortgage, Inc. and Cenlar FSB "have known of the facts upon which its proposed amendment is based . . . , not only at the time that it filed its original answer, but for years prior," yet "failed to include the counterclaim in their original answer."  Counterclaim Response at 4.  J. Gallegos and L. Gallegos, therefore, assert that CitiMortgage, Inc. and Cenlar FSB "have no justification for proposing to bring the counterclaim now."  Counterclaim Response at 4.

### 8.    The Counterclaim Reply.

CitiMortgage, Inc. and Cenlar FSB reply to the Counterclaim Response.  See Defendants CitiMortgage, Inc.'s and Cenlar FSB's Reply in Support of Motion for Leave to File Counterclaim, filed December 29, 2021 (Doc. 100)("Counterclaim Reply").   In the Counterclaim Reply, CitiMortgage, Inc. and Cenlar FSB make four arguments.  See Counterclaim Reply at 1-3.  First, CitiMortgage, Inc. and Cenlar FSB assert that their proposed counterclaims are meritorious, because they are equitable.  See Counterclaim Reply at 1.  CitiMortgage, Inc. and Cenlar FSB

---

[6]The Rooker-Feldman doctrine "precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court."  Miller v. Deutsche Bank Nat'l Tr. Co (In re Miller), 666 F.3d 1255 (10th Cir. 2012).  See Dist. of Columbia Ct. of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fidelity Tr. Co., 263 U.S. 413 (1923).

assert that they rely on equity and not contract to assert their counterclaim, and that "New Mexico has long protected creditors from the unfairness and/or unjust enrichment of allowing parties such as Plaintiff to unjustly profit from the payments of others." Counterclaim Reply at 2. Second, CitiMortgage, Inc. and Cenlar FSB argue that the prior exclusive jurisdiction doctrine does not apply, because the State court "did not retain jurisdiction over this case (to the extent it had jurisdiction)." Counterclaim Reply at 2. According to CitiMortgage, Inc. and Cenlar FSB, if the State court ever had jurisdiction in the last two years, it expired thirty days after the Brickhouse Order was entered. Counterclaim Reply at 2.

Third, CitiMortgage, Inc. and Cenlar FBS contend that J. Gallegos and L. Gallegos' Rooker-Feldman and res judicata arguments are incorrect, because, if res judicata applies, "then this whole lawsuit would have violated the compulsory counterclaim rule," and because Rooker-Feldman does not bar the proposed counterclaim, since the Court "has jurisdiction over this entire case, a condition initiated when Plaintiffs chose to file this lawsuit." Counterclaim Reply at 3. Fourth, CitiMortgage, Inc. and Cenlar FSB allege that rule 15(a)(2) of the Federal Rules of Civil procedure favors permitting the counterclaim, and that it does not appear that J. Gallegos and L. Gallegos oppose permitting the counterclaim under rule 15(a)(2). See Counterclaim Reply at 3. Moreover, J. Gallegos and L. Gallegos assert that J. Gallegos and L. Gallegos are "silent" on timeliness. Counterclaim Reply at 3.

9.      **The December 20, 2021, Hearing**.

The Court held a hearing on the MTD on December 20, 2021. See Clerk's Minutes, filed December 20, 2021 (Doc. 98). The hearing began with Trans Union summarizing the facts. See Draft Transcript of December 20, 2021, Hearing at 4:23-5:4 (taken December 20,

2021)(Merar)("Tr.").[7]   Trans Union contended that the original State foreclosure lawsuit "was disposed on via summary judgment in favor of the plaintiffs," and that Judge Brickhouse concluded that CitiMortgage, Inc. "was not in possession of the note, and therefore, could not enforce the note."  Tr. at 5:5-9 (Merar).  Trans Union stressed that "the order did not hold anything other than that fact."  Tr. at 5:9-10 (Merar).  Trans Union argued that J. Gallegos and L. Gallegos are now contending that, "not only did the order hold that Citi could not enforce the note, but that they could not collect on the outstanding balance" and that "any ongoing credit reporting of that balance was therefore inaccurate."  Tr. at 5:11-16 (Merar).  Trans Union explained that it, along with Equifax Information and Experian Information, it believes that the Court should dismiss the Complaint "on the basis that plaintiffs have presented a legal dispute that they were not required to resolve."  Tr. at 5:18-20 (Merar).  According to Trans Union, "numerous appellate courts and district courts across the country" have held that CRAs "are not the appropriate outlet to launch collateral attacks on the validity of debt."  Tr. at 5:20-24 (Merar).  Trans Union asserted that J. Gallegos and L. Gallegos do not allege that "anything about the reporting is factually inaccurate, such as ownership, account balance, late payments, or anything else," but are instead "contesting the debt, because they believe they have a legal basis to not have to be responsible for it."  Tr. at 6:1-6 (Merar).  Trans Union stated that J. Gallegos and L. Gallegos' argument is flawed, because "they have interpreted the order in one way, presented that interpretation to the CRAs, and they're now complaining that the CRAs didn't accept that legal interpretation."  Tr. at 6:8-11 (Merar).

---

[7]The Court's citations to the draft transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Trans Union contended that J. Gallegos and L. Gallegos just want to extinguish their debt, but that doing so would "vitiate the purpose of the FCRA to the point that it's relevant for creditors to know that the plaintiffs defaulted on their loan." Tr. at 7:3-5 (Merar). Trans Union argued that the Brickhouse Order does not "obliterate[]" their argument, because the Brickhouse Order states only that "Citi doesn't have standing to enforce the note and to foreclose on it," and does not state that "the debt is extinguished or that the plaintiffs are somehow no longer liable for the outstanding balance." Tr. at 7:15-19 (Merar). According to Trans Union, "these are legal issues that the CRAs don't have an obligation to resolve." Tr. at 7:20-21 (Merar).

CitiMortgage, Inc. and Cenlar FSB noted that, when J. Gallegos and L. Gallegos filed their initial Complaint -- before they added their FCRA claims -- there "was an allegation in there vaguely referencing some sort of dissatisfaction with the credit reporting or credit furnishing," which was not "fleshed out too much." Tr. at 8:11-14 (Alonso). CitiMortgage, Inc. and Cenlar FSB stated that they have "since deleted the trade line, which I think moots the entire FCRA claim, especially as it relates to the CRAs." Tr. at 8:16-19 (Alonso). Equifax Information then noted that it agrees that the Brickhouse Order is not clear and "that's only further evidenced by the fact that plaintiffs filed a motion seeking clarity on the order's silence about the impact on their credit reporting." Tr. at 9:11-14 (Stieber). Equifax Information argued that "the CRAs should not be held responsible for interpreting the order in the same manner that the plaintiffs argue it should be interpreted." Tr. at 9:16-19 (Stieber). Equifax Information contended that fairness also counsels in its favor, because, if J. Gallegos and L. Gallegos' interpretation of the Brickhouse Order governs, then the CRAs would be in an "extremely onerous position of having to figure out what legal disputes occurred between the furnisher and the consumer, and how they should be reporting on a credit report, which is not their burden to bear." Tr. at 9:25-10:4 (Stieber). Equifax

Information asserted that J. Gallegos and L. Gallegos' interpretation would put creditors in a position of having to determine whether the information available to them through credit reports is accurate.  See Tr. at 10:5-12 (Stieber).

Next, Experian Information reiterated its contention that "this debt exists" and that "simply because there was an order saying that Cenlar/Citi could not enforce the note does not mean that the debt itself was extinguished."  Tr. at 11:2-5 (Taylor).  Experian Information agreed with Equifax Information that "future creditors will want to know that these plaintiffs took out this mortgage and they did not pay for this debt."  Tr. at 11:7-9 (Taylor).  According to Experian Information, the CRAs are not reporting inaccurate information, so the Court should dismiss J. Gallegos and L. Gallegos' claims.  See Tr. at 11:10-13 (Taylor).

J. Gallegos and L. Gallegos countered, arguing that the Court should deny the MTD.  See Tr. at 11:20-21 (Fleming).  J. Gallegos and L. Gallegos stated that the Brickhouse Order indicates that CitiMortgage, Inc. and Cenlar FSB neither have the power nor the ability to enforce the promissory note, because a prior holder lost it before CitiMortgage bought the mortgage.  See Tr. at 11:22-12:2 (Fleming).  J. Gallegos and L. Gallegos asserted that, despite the Brickhouse Order, CitiMortgage, Inc. and Cenlar FSB "continued to report a delinquent debt to the Gallegoses' credit report," which is "inaccurate reporting," and "caused the Gallegoses to be denied needed credit, leaving them unable to get a loan to purchase a second car for their household."  Tr. at 12:5-8 (Fleming).  The Court interjected, noting that saying that the note is owned and can be enforced are separate, meaning that there is "nothing really inaccurate about the statement that they own the note, is there?"  Tr. at 12:21-22 (Court).  J. Gallegos and L. Gallegos contended that the information is inaccurate, because the Brickhouse Order says that CitiMortgage, Inc. does not have standing to enforce the note and that "they don't own the note."  Tr. at 13:17-19 (Fleming).

J. Gallegos and L. Gallegos agreed that the Brickhouse Order does not extinguish their debt, noting that the "actual holder" of the note can "come forward and report" J. Gallegos and L. Gallegos' credit reports, collect the debt, and foreclose on the property.  Tr. at 14:1-7 (Fleming). J. Gallegos and L. Gallegos argued that they brought this case because CitiMortgage, Inc. and Cenlar FSB have reported the debt on J. Gallegos and L. Gallegos' credit reports, but the Brickhouse Order "has said the debt as to Citi is inaccurate."  Tr. at 14:11-12 (Fleming).  J. Gallegos and L. Gallegos then addressed DeAndrade v. TransUnion LLC, 523 F. 3d at 68, contending that it supports denying the MTD, because in "every case where FCRA claims were dismissed pursuant to [DeAndrade v. TransUnion LLC, 523 F. 3d at 68]" it was "significant that the FCRA plaintiffs . . . lacked an earlier court order regarding the validity of the disputed debt." Tr. at 15:2-6 (Fleming).  J. Gallegos and L. Gallegos asserted that DeAndrade v. TransUnion LLC, 523 F. 3d at 68, supports their contention that, if a court rules a mortgage invalid, and if Trans Union continues to report it as a valid debt, then "the consumer would have grounds for a potential FCRA claim." Tr. at 15:7-12 (Fleming).  According to J. Gallegos and L. Gallegos, it is dispositive that the Brickhouse Order "resolv[es] the dispute."  Tr. at 15:25 (Fleming).

J. Gallegos and L. Gallegos asked rhetorically whether the CRAs have ever refused to report a money judgment because the judgment "didn't specifically say: This money judgment shall be reported to the credit bureaus," suggesting that the CRAs "report judgments adjudicating debts that don't explicitly say the debt can be reported."  Tr. at 15:11-14 (Fleming).  J. Gallegos and L. Gallegos asserted that the same standard should apply here.  See Tr. at 16:15 (Fleming).  J. Gallegos and L. Gallegos concluded by stating that the CRA defendants "were presented with a court order determining that Citi's enforcement of this debt was invalid," and that the CRAs "had

a duty to investigate and delete Citi's inaccurate reporting, and they did not do that." Tr. at 16:17-21 (Fleming).

Experian Information responded, acknowledging that, unlike in DeAndrade v. TransUnion LLC, 523 F. 3d at 68, Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876 (9th Cir. 2010), and its progenies, there is an underlying court order here.  See Tr. at 17:4-11 (Taylor).  Experian Information contended that, here, however, the Brickhouse Order is not clear.  See Tr. at 17:4-11 (Taylor).  According to Experian Information, "there is no clear order that the credit reporting agencies can make a decision on." Tr. at 17:15-16 (Fleming).

Equifax Information then responded, contending that the Brickhouse Order recognizes CitiMortgage, Inc. as the holder of the relevant debt and that the Brickhouse Order's conclusion does not relieve J. Gallegos or L. Gallegos from the debt.  See Tr. at 18:15-16 (Stieber).  According to Equifax Information, the Brickhouse Order rules "only" that CitiMortgage, Inc. "couldn't recover in this particular court case on that note." Tr. at 18:14-16 (Stieber).  Further, Equifax Information contended that, even if the Court concludes that there is an inaccuracy, because CitiMortgage, Inc. cannot report the debt, J. Gallegos and L. Gallegos are not harmed.  See Tr. at 19:21-25 (Stieber).  Equifax Information noted that, if the debt's original holder "was able to report that debt" on J. Gallegos and L. Gallegos's credit file, then "the same result would happen," meaning that the "debt exists, it was reported, and a creditor relied on that debt to determine that plaintiffs would not be eligible for credit." Tr. at 19:6-15 (Stieber).  Equifax asserted that, either way, "the debt was still owed and unpaid." Tr. at 19:19 (Stieber).  CitiMortgage, Inc. agreed, asserting that "the question here is: Who not what?  Who can report this?  Who can furnish the information regarding this debt?" Tr. at 20:6-8 (Alonso).

Trans Union replied, arguing that the Brickhouse Order's existence "is dispositive of whether there is any factual or legal inaccuracies." Tr. at 21:1-3 (Merar). Trans Union then read a passage from Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, which states:

> [a] consumer disputing the validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher . . . . The CRA is not required as part of its investigation to provide a legal opinion on the merits. Indeed, determining whether the consumer has a valid defense is a question for a court to resolve in a suit against the creditor, not a job imposed upon by consumer reporting agencies by the FCRA.

Tr. at 21:6-15 (Merar)(quoting Carvalho v. Equifax Info. Servs., LLC, 629 F.3d at 892). Equifax Information alleges that "what the plaintiffs are asking the CRAs to do here is exactly that," namely "providing a legal defense as to why they don't owe that debt or why it shouldn't be reported. And that's not something that courts, based on their reading of the FCRA, require CRAs to do." Tr. at 21:16-22 (Merar). Further, Equifax Information Services reiterated that, even if the Brickhouse Order is clear, it does not mean that the debt is extinguished, but only that "the debt is unrecoverable because there can be no deficiency judgment against the debtor." Tr. at 22:8-9 (Merar).

The Court stated that it was not prepared to give an oral ruling on the MTD, because it wants to study further the issue. See Tr. at 22:21-23:4 (Court). Having concluded the argument on the MTD, the Court then gave the parties an opportunity to argue about Defendants Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union LLC's Motion to Stay Discovery, filed October 28, 2021 (Doc. 63). See Tr. at 23:5-8 (Court)("Discovery Motion"). The Parties briefly argued about the Discovery Motion, before the Court eventually denied it. See Tr. at 28:10 (Court).

10.    <u>**The January 5, 2021, Hearing**</u>.

The Court held a hearing on the MFA and the Counterclaim Motion on January 5, 2022. <u>See</u> Amended Clerk's Minutes, filed January 5, 2022 (Doc. 127).  The hearing began with the Court stating that it is not inclined to grant the MFA.  <u>See</u> Transcript of Motion Proceedings, at 4:8-23 ("taken January 5, 2022), filed January 21, 2022 (Doc. 121)("Jan. Tr.")(Court).  The Court then gave CitiMortgage, Inc. an opportunity to argue in favor of its MFA.  <u>See</u> Jan. Tr. at 4:24 (Court).

CitiMortgage, Inc. began its argument by summarizing the Court's Order, asserting that the Court "entered an order that authorized or allowed us to send mortgage statements to counsel for the plaintiffs," and arguing that J. Gallegos and L. Gallegos are now, "in essence, backdoor suing us in state court for sending mortgage statements."   Jan. Tr. at 5:13-28 (Smith). CitiMortgage, Inc. stated that it is "highly irregular to order a state court to do something," but that the Court has "the parties in front of you and you have jurisdiction over the parties and you can issue instructions and orders as you will in order to allow this Court to administer this case without disruption."  Jan. Tr. at 5:22-6:2 (Smith).  CitiMortgage, Inc. explained that Judge Brickhouse issued the Brickhouse Order in 2019, which, CitiMortgage, Inc. contended, states that CitiMortgage, Inc. "did not have standing arising from a lost note," does not "void the note" and does not "extinguish the note or the mortgage," but "simply dismissed the case based upon standing." Jan. Tr. at 5:10-14 (Smith).  CitiMortgage, Inc. asserted that, between August 19, 2019, and September 19, 2019, J. Gallegos and L. Gallegos "had an opportunity to get an order from the state court to address the issues that they're now complaining about, which is how was servicing to occur."  Jan. Tr. at 6:15-20 (Smith).  CitiMortgage, Inc. then asserted that, on May 11, 2021, J.

Gallegos and L. Gallegos "did not move for an order to show cause in the original lawsuit," but chose instead to file this lawsuit. Jan. Tr. at 6:25-7:1 (Smith).

CitiMortgage, Inc. explained that J. Gallegos and L. Gallegos moved for an injunction "complaining about property inspections, and they also complained about the sending of mortgage statements." Jan. Tr. at 5:13-28 (Smith). According to CitiMortgage, Inc., the Court held a hearing, at which CitiMortgage, Inc. asked if it can continue sending mortgage statements to J. Gallegos and L. Gallegos' attorney, and J. Gallegos and L. Gallegos agreed. See Jan. Tr. at 7:20-8:4 (Smith). The Court noted that it sat at the computer and typed out the Order itself, wanting to "make sure everybody got what they needed out of it." Jan. Tr. at 8:11-12 (Court). CitiMortgage, Inc. asserted that J. Gallegos and L. Gallegos filed a motion to show cause in the State case less than two weeks later. See Jan. Tr. at 8:13-16 (Smith). The Court asked whether CitiMortgage, Inc. still wants to collect on the mortgage. See Jan. Tr. at 8:23-24 (Court). CitiMortgage, Inc. stated that it does not necessarily want to collect on the mortgage, but that it continues to send statements because of "Reg X,[8] which is issued by the Consumer Financial Protection Bureau, [and] which requires mortgage statements to be sent within, I think, five days of the end of the grade period" and that "there are no exceptions to Reg X that I'm aware of." Jan. Tr. at 8:25-9:5 (Smith). CitiMortgage, Inc. alleged that not sending the mortgage statements would be a violation of the Consumer Financial Protection Bureau's regulations. See Jan. Tr. at 9:19-24 (Smith). CitiMortgage, Inc. stated that it is not sending the statements because it wants somebody to pay them, because a mortgage statement is "not really a bill." Jan. Tr. at 10:13 (Smith). CitiMortgage, Inc. explained that it is sending the statements because the mortgage is "in limbo" until it "gets

---

[8]"Reg X" refers to 12 C.F.R. § 1024, a regulation issued by the Consumer Financial Protection Bureau to implement the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601-2617.

transferred to whoever has the note and the mortgage." Jan. Tr. at 11:2-5 (Smith).  CitiMortgage, Inc. contended that it is trying to send the statements "pursuant to this Court's order, not for some improper purpose." Jan. Tr. at 11:14-15 (Smith).  CitiMortgage, Inc. argued that, as a result, it is now facing "activity in state court that's complaining about it as if you had not issued that order." Jan. Tr. at 11:22-24 (Smith).

According to CitiMortgage, Inc., it needs to continue to send the mortgage statements, because J. Gallegos and L. Gallegos' mortgage is still valid debt, so somebody needs to service it until someone else takes on the debt.  See Jan. Tr. at 12:5-15 (Smith).  According to CitiMortgage, Inc., an order from Judge Brickhouse allowing CitiMortgage, Inc. not to send the statements to J. Gallegos and L. Gallegos' attorney would conflict with the Court's Order, and would not be possible, because the State court no longer has jurisdiction.  See Jan. Tr. at 12:19-25 (Smith).

The Court indicated that an order may not be appropriate at the moment and that, if Judge Brickhouse does not issue an order at the January 19, 2022, hearing on the sanctions motion, then CitiMortgage, Inc. does not have to deal with conflicting orders.  See Jan. Tr. at 13:15-14:5 (Court). CitiMortgage, Inc. asserted that the All Writs Act was designed to prevent a situation like this one, namely CitiMortgage, Inc. being sued in State court for complying with the Court's Order.  See Jan. Tr. at 15:1-7 (Smith).  CitiMortgage, Inc. argued that, right now, it cannot defend itself in State court "other than to say I've got a federal court order," but that it "shouldn't have to do that in the first place." Jan. Tr. at 16:2-4 (Smith).  The Court noted that J. Gallegos and L. Gallegos likely will want CitiMortgage, Inc. to fix the problem that is causing it to continue to send the mortgage statements.  See Jan. Tr. at 16:16-24 (Court).  CitiMortgage, Inc. responded that "it's not a problem.  It's the law." Jan. Tr. at 16:25-17:1 (Smith).  The Court observed that CitiMortgage, Inc. does not have to send statements for "eternity," because it could transfer its obligation to

service the mortgage.  Jan. Tr. at 17:23-25 (Court).  The Court stated that, until CitiMortgage, Inc.

secures the transfer, J. Gallegos and L. Gallegos "gets to complain about it."  Jan. Tr. at 18:5

(Court).

In response, CitiMortgage, Inc. stated that J. Gallegos and L. Gallegos should make their

complaints in federal court rather than State court, because the State court no longer has

jurisdiction.  See Jan. Tr. at 18:6-23 (Smith).  CitiMortgage, Inc. asserted that the Court has

"exclusive jurisdiction" over this case, because this case was removed from State court.  Jan. Tr.

at 19:17-18 (Smith).  The Court noted that it is "not quite convinced," because "most foreclosure

actions occur in state court, not in federal court," so "the fact that somebody is telling me a federal

court has exclusive jurisdiction over this dispute is not convincing me until I really study it."  Jan.

Tr. at 20:11-17 (Court).  CitiMortgage, Inc. sought to clarify, noting that it does not suggest that

the Court has jurisdiction over the foreclosure, but believes that the Court has jurisdiction "over

the servicing of this loan from the time they filed their lawsuit and all claims they made in their

lawsuit."  Jan. Tr. at 20:20-22 (Court).

CitiMortgage, Inc. asserted that, after this hearing was set, J. Gallegos and L. Gallegos filed

a motion for leave to file additional claims, which raises the same issues as a reply brief they filed

in State court.  See Jan. Tr. at 21:5-16 (Smith).  CitiMortgage, Inc. argued that, consequently, the

Court must "do something to protect what's going on in this court."  Jan. Tr. at 21:18-19 (Smith).

CitiMortgage, Inc. contended that, because J. Gallegos and L. Gallegos did not file their motion to

show cause on May 11, 2021, and instead filed a new lawsuit, J. Gallegos and L. Gallegos do not

believe that the State court has jurisdiction, and that there is "no need for the new lawsuit if what

they're saying was correct."  Jan. Tr. at 22:4-5 (Smith).

The Court then offered Experian Information and Trans Union an opportunity to add to CitiMortgage, Inc.'s arguments, but neither had anything to add.  See Jan. Tr. at 22:14-23-3 (Court, Taylor, Sheldon).  J. Gallegos and L. Gallegos then began their argument, indicating that they never wanted to be in federal court, but that this case was removed.  See Jan. Tr. at 23:13-15 (Kramer).  J. Gallegos and L. Gallegos stated that they filed the State case and that they "could have reopened the foreclosure action and brought those claims there," but "we didn't have to." Jan. Tr. at 23:16-19 (Kramer).  According to J. Gallegos and L. Gallegos, the "claims in the state court action which were removed here are based on facts that didn't exist in 2019," and that it "seemed to us to be cleaner to just have the foreclosure case over here in state court in front of Judge Brickhouse, and the consumer protection case saying, hey, you can't collect on this note." Jan. Tr. at 23:20-25 (Kramer).  J. Gallegos and L. Gallegos stated that they are "shocked" that CitiMortgage, Inc. "keeps demanding payment" by sending these mortgage statements saying that failing to pay "will result or may result in a loss of your home."  Jan. Tr. at 24:9-13 (Kramer).  J. Gallegos and L. Gallegos alleged that the mortgage statements are not "nice little love letters." Jan. Tr. at 24:10-11 (Kramer).  According to J. Gallegos and L. Gallegos, there is "no basis for a new foreclosure," because of "res judicata, collateral estoppel, and all those fun things."  Jan. Tr. at 24:16-18 (Kramer).  J. Gallegos and L. Gallegos indicated that they agree with the Court that both this case and the State can "can exist simultaneously," and that foreclosure is "uniquely a state matter in front of Judge Brickhouse," but that "we are not seeking consumer protection remedies in front of Judge Brickhouse," because "[w]e're doing that here."  Jan. Tr. at 25:2-5 (Kramer).

J. Gallegos and L. Gallegos admitted that "some of the statements are overlapping because in this Court it's the basis for more claims."  Jan. Tr. at 25:6-7 (Kramer).  J. Gallegos and L.

Gallegos asserted that every statement that CitiMortgage, Inc. sends is the basis for a new claim, and that CitiMortgage, Inc. lied to Judge Brickhouse when they told her expressly in a pleading that "[w]e're not doing anything with this loan anymore.  We don't even service this loan."  Jan. Tr. at 25:11-13 (Kramer).  J. Gallegos and L. Gallegos's attorney stated that he "is a student of Reg X, because I used to enforce it for the State of New Mexico," and that there is "absolutely nothing in Reg X that requires a lender to send a statement on a loan when it has genuine doubt about whether it can enforce it."  Jan. Tr. at 25:16-20 (Kramer).

J. Gallegos and L. Gallegos asserted that the "big picture" is that CitiMortgage, Inc. does not want to litigate these issues in State court in front of Judge Brickhouse, "because they violated her order, and then they lied to her."  Jan. Tr. at 26:3-6 (Kramer).  According to J. Gallegos and L. Gallegos, "that doesn't mean that this Court can tell Judge Brickhouse that she can't do anything" and that the "only matters right now pending before Judge Brickhouse are for an order to show cause on why they're continuing to collect and a motion for sanctions for lying to her."  Jan. Tr. at 26:7-13 (Kramer).  J. Gallegos and L. Gallegos asserted that "[n]either of those things have anything to do with this Court's order."  Jan. Tr. at 26:13-14 (Kramer).

The Court noted that its Order says that CitiMortgage, Inc. can direct its statements to J. Gallegos and L. Gallegos' counsel and asked if that is "going to be an issue that you're going to complain about in front of Judge Brickhouse."  Jan. Tr. at 26:21-23 (Court).  J. Gallegos and L. Gallegos stated that they believe CitiMortgage, Inc. should not be sending any mortgage statements at all, but argued that sometimes large banks have technological difficulties that preclude them from having precise control over where and when they send statements, which is why J. Gallegos and L. Gallegos agreed that, if CitiMortgage, Inc. is going to send statements, CitiMortgage, Inc. should direct them to J. Gallegos and L. Gallegos' attorney.  See Jan. Tr. at

27:1-15 (Kramer).  J. Gallegos and L. Gallegos argued that CitiMortgage, Inc. is incorrect that its mailed statements are not asking for payment, alleging that the statements say: "If you don't pay, we're going to take your house" and contending that there is "no way on God's green earth that that's not a demand for payment."  Jan. Tr. at 27:18-20 (Kramer).  J. Gallegos and L. Gallegos alleged that they were under the impression that, when the Court wrote the Order, they maintained their objection to CitiMortgage, Inc. continuing to send statements.  See Jan. Tr. at 27:23-28:3 (Kramer).

J. Gallegos and L. Gallegos argued that the All Writs Act does not give the Court the power to tell Judge Brickhouse to stop managing her case.  See Jan. Tr. at 28:4-6 (Kramer).  J. Gallegos and L. Gallegos contended that CitiMortgage, Inc. wrongly asserts that the State case is closed, because the case has been reopened.  See Jan. Tr. at 28:7-14 (Kramer).  In response to the Court's question, J. Gallegos and L. Gallegos clarified that they asked for the Court's Order to prevent CitiMortgage, Inc. from continuing to inspect the house or to send statements, but that, if CitiMortgage, Inc. is going to send statements, to direct them to J. Gallegos and L. Gallegos' counsel.  See Jan. Tr. at 29:20-30:6 (Kramer).  The Court asked whether it should amend the Order, or whether J. Gallegos and L. Gallegos merely should clarify their position that CitiMortgage, Inc. should not be sending any statements.  See Jan. Tr. at 30:17-31:9 (Court, Kramer).  J. Gallegos and L. Gallegos reiterated their assertion that CitiMortgage, Inc. cannot send the statements, because it cannot recover on the mortgage as a result of the Brickhouse Order, and that the All Writs Act does not give the Court the power to "tell Judge Brickhouse to stop doing whatever she wants to do in terms of the order to show cause and sanctions motion."  Jan. Tr. at 32:8-12 (Kramer).

Experian Information and Trans Union again declined an opportunity to speak.  See Jan. Tr. at 32:16-24 (Court, Taylor, Sheldon).   CitiMortgage, Inc. then presented a notebook of proposed exhibits to the Court, which the Court accepted, declined to admit, but noted that it would think about whether it may consider them when it writes the opinion.  See Jan. Tr. at 32:24-36:15 (Smith, Court).  CitiMortgage, Inc. noted that it has a corporate representative available at the hearing to speak if necessary.  See Jan. Tr. at 36:16-19 (Smith).  The Court suggested that it could amend its Order to say that J. Gallegos and L. Gallegos are not waiving their position that "sending these statements are a violation of the law, but you can continue to send them to counsel."  Jan. Tr. at 37:10-13 (Court).  CitiMortgage, Inc. responded that the Court could amend the Order, but asserted that it would, then, "not make sense for them to run to state court and complain about it, when he can do it in this court."  Jan. Tr. at 37:14-16 (Smith).  The Court stated that it still is not sure why J. Gallegos and L. Gallegos must bring their complaints in federal court rather than State court.  See Jan. Tr. at 37:22-25 (Court).  CitiMortgage, Inc. again asserted that the Court "took jurisdiction of the complaints about servicing post-2019" and that "[n]o other court has jurisdiction."  Jan. Tr. at 38:1-3 (Smith).  J. Gallegos and L. Gallegos explained that, if they try to consolidate their issues into the State case, CitiMortgage, Inc. and Cenlar FSB will want to remove the case to federal court.  See Jan. Tr. at 39:8-12 (Kramer).

J. Gallegos and L. Gallegos asserted that, had CitiMortgage, Inc. admitted they erred by sending statements, they probably would have settled the case, but now CitiMortgage, Inc. has exposed itself to punitive damages.  See Jan. Tr. at 39:13-25 (Kramer).  J. Gallegos and L. Gallegos contended that CitiMortgage, Inc. does not want to be in front of Judge Brickhouse, "because she knows the history of the foreclosure, and she knows what she ordered."  Jan. Tr. at 40:15-17 (Kramer).  J. Gallegos and L. Gallegos stated that the cleanest solution involves three things:

- 34 -

(i) amend the Order to make it clear that they do not consent to CitiMortgage, Inc. sending them statements; (ii) wait and see what Judge Brickhouse does in the foreclosure action; and (iii) "keep this case going for now on the consumer protection claims."  Jan. Tr. at 41:14-15 (Kramer).

According to CitiMortgage, Inc., the "simple route" is for the Court to "ask and order the plaintiffs to withdraw the currently pending motions," and to bring "whatever complaints they have about the sending of statements" in federal court.  Jan. Tr. at 43:1-4 (Smith).  CitiMortgage, Inc. stated that it does not want to be "exposed to jeopardy in state court for something that should be occurring in" federal court, and that "we did in compliance with a court order."  Jan. Tr. at 43:8-10 (Smith).  In response, the Court proposed just "leav[ing] it," concluding that Judge Brickhouse "is going to understand the situation," namely, that "the plaintiffs asked that basically you quit sending the statements" and that "everybody preserved their position."  Jan. Tr. at 43:15-21 (Court).  The Court noted that the situation is "pretty clear": CitiMortgage, Inc. thinks it can continue sending statements; and J. Gallegos and L. Gallegos thinks that CitiMortgage, Inc. cannot continue sending statements.  Jan. Tr. at 43:22-23 (Court).  CitiMortgage, Inc. stated that it could "live with" J. Gallegos and L. Gallegos withdrawing their State court sanctions motion "in exchange for an order from your Court that orders us not to send statements."  Jan. Tr. at 44:1-3 (Smith).  The Court explained that it can amend the Order to make it clear that it does not "change the substance of the claims," because the Order "was simply trying to work out where these statements go."  Jan. Tr. at 44:8-9 (Court).  The Court stated that it "didn't intend to say that [J. Gallegos and L. Gallegos] don't have a claim for you sending these statements out" and that it was "trying to avoid these statements upsetting individuals."  Jan. Tr. at 44:20-45:3 (Court).  The Court explained that its Order does not authorize or legalize CitiMortgage, Inc. to send statements, and

that the Order's purpose is to "not upset the Gallegoses with getting them in the mail."  Jan. Tr. at

46:5-6 (Court).  The Court stated that it will deny the MFA.  See Jan. Tr. at 46:15-17 (Court).

   Before the hearing turned to the Counterclaim Motion, the Court admitted CitiMortgage,

Inc.'s exhibits A through L,[9] because J. Gallegos and L. Gallegos noted that they do not object,

see Jan. Tr. at 48:5-7 (Kramer), and all parties agreed that J. Gallegos and L. Gallegos' Motion for

Leave to File Supplemental Claims, filed December 23, 2021 (Doc. 93), does not moot the MTD,

see Jan. Tr. at 47:7-25 (Taylor, Court, Kramer).  CitiMortgage, Inc. and Cenlar FSB then began

their argument about their Counterclaim Motion, asserting that their counterclaim for an equitable

lien is "meritorious at least for the purpose of this hearing," and that they are "not seeking to

enforce the note or the mortgage."  Jan. Tr. at 50:1-3 (Alonso).  CitiMortgage, Inc. and Cenlar FSB

argued that J. Gallegos and L. Gallegos' quiet title claim "[e]ssentially . . . seeks to wipe the

mortgage," whereas a claim for equitable lien is "rooted in unjust enrichment," which is "an

entirely different cause of action than seeking to enforce the note or mortgage."  Jan. Tr. at 50:7-

12 (Alonso).

---

[9]CitiMortgage, Inc.'s exhibit A is the Brickhouse Order.  Exhibit B is J. Gallegos and L. Gallegos' Motion for an Order to Show Cause in the State court suit, CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195.  Exhibit C is J. Gallegos and L. Gallegos' Reply to Defendants' Response to Homeowners' Motion for an Order to Show Cause in the State court suit, CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195.  Exhibit D is J. Gallegos and L. Gallegos' Sanctions Motion in in the State court suit, CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195.  Exhibit E is the J. Gallegos and L. Gallegos' Reply to Defendant's Response to Homeowners' Motion for Sanctions in the State court suit, CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195.  Exhibit F is the Court's September 27, 2021, Order.  Exhibit G is a Mortgage Statement from Cenlar FSB to J. Gallegos and L. Gallegos, dated November 2, 2020.  Exhibit H is a Mortgage Statement from Cenlar FSB to J. Gallegos and L. Gallegos, dated June 1, 2022.  Exhibit I is a Mortgage Statement from Cenlar FSB to J. Gallegos and L. Gallegos, dated October, 1, 2021.  Exhibit J is a Mortgage Statement from Cenlar FSB to J. Gallegos and L. Gallegos, dated November 1, 2021.  Exhibit K is a Mortgage Statement from Cenlar FSB to J. Gallegos and L. Gallegos, dated December 1, 2021.  Exhibit L is an email from David Kramer to Gabriella Alonso, Elizabeth Drantell, Cassie Fleming, and Jordyn Whisenant, dated November 16, 2021.

CitiMortgage, Inc. and Cenlar FSB stated that their claim seeks to "recoup some $10,000 in taxes and fees paid on the property under the theory of unjust enrichment, whether that's through the equitable lien, a money judgment, or both." Jan. Tr. at 50:17-20 (Alonso). CitiMortgage, Inc. and Cenlar FSB asserted that neither collateral estoppel nor res judicata applies here, because, if those doctrines applied, then "this entire lawsuit would be barred if it is plaintiffs' position, and [it] has always been plaintiffs' position, that it is unlawful for Citi and Cenlar to collect, service, or otherwise make representations on the loan." Jan. Tr. at 50:23-51:2 (Alonso). CitiMortgage, Inc. and Cenlar FSB next contended that prior exclusive jurisdiction also does not bar their claim, because, for that doctrine to apply, the "state court would have had to exercise control, obtain possession, or take custody of the property," but Judge Brickhouse declined to take possession by entering the Brickhouse Order, and J. Gallegos and L. Gallegos did not appeal the Brickhouse Order, so, pursuant to rule 1-059(e) of the New Mexico Rules of Civil Procedure, the State court's ability to exercise jurisdiction expired thirty days after the Brickhouse Order's entry. Jan. Tr. at 51:6-8 (Alonso). In addition, CitiMortgage, Inc. and Cenlar FSB alleged that <u>Rooker-Feldman</u> does not bar their proposed counterclaim, because J. Gallegos and L. Gallegos initiated the lawsuit, so the equitable lien or unjust enrichment claim would "arguably be a compulsory counterclaim," and because CitiMortgage, Inc. and Cenlar FSB "are not asking the Court to revisit or overturn or otherwise alter the" Brickhouse Order. Jan. Tr. at 52:5-12 (Alonso). Finally, CitiMortgage, Inc. and Cenlar FSB argued that the Court should grant their Counterclaim Motion, because rule 15(a)(2) of the Federal Rules of Civil Procedure "encourages courts to freely grant leave for parties to amend pleadings, or in this case add counterclaims." Jan Tr. at 52:19-22 (Alonso).

J. Gallegos and L. Gallegos then argued against the Counterclaim Motion, asserting that, if CitiMortgage, Inc. and Cenlar FSB paid taxes and insurance on J. Gallegos and L. Gallegos'

home, then they "made a gift" by "continuing to pay things they were not legally obligated to pay." Jan Tr. at 53:17-19 (Kramer).  According to J. Gallegos and L. Gallegos, the Counterclaim Motion is about "property preservation, the sending of statements, [and] the payment of insurance and taxes," because it may be the result of CitiMortgage, Inc. and Cenlar FSB's "computerized machinery that they cannot often control," which is "not the fault of the consumer and is not a defense."  Jan. Tr. at 53:21-54:1 (Kramer).  J. Gallegos and L. Gallegos contended that they did not ask CitiMortgage, Inc. and Cenlar FSB to pay taxes and insurance, and that "[t]hey voluntarily did that."  Jan. Tr. at 54:5 (Kramer).  In addition, J. Gallegos and L. Gallegos argued that an equitable lien is "a lien on real property" and is "something uniquely positioned for state court." Jan. Tr. at 54:6-8 (Kramer).  J. Gallegos and L. Gallegos maintained that CitiMortgage, Inc. and Cenlar FSB's tax and insurance payments are a gift, and asserted that, if CitiMortgage, Inc. and Cenlar FSB wanted a lien, they could have asked Judge Brickhouse for one in 2018, 2019, or 2020. See Jan. Tr. at 54:13-18 (Kramer).  J. Gallegos and L. Gallegos asserted that collateral estoppel, res judicata, and Rooker-Feldman all apply, and bar the proposed counterclaim, but noted that, if CitiMortgage, Inc. and Cenlar FSB want to assert an unjust enrichment claim, that J. Gallegos and L. Gallegos would "probably not oppose that," even though that is a counterclaim that CitiMortgage, Inc. and Cenlar FSB "should have raised long ago."  Jan. Tr. at 55:8 (Kramer).

J. Gallegos and L. Gallegos noted that the lien "triggers" them, because CitiMortgage, Inc. and Cenlar FSB are in federal court asking for a lien "after they lost their express lien argument in front of Judge Brickhouse two years ago," and that the counterclaim is "futile on the merits and on jurisdiction."  Jan. Tr. at 55:9-16 (Kramer).  J. Gallegos and L. Gallegos stated that they are willing to offer to proceed to mediation on CitiMortgage, Inc. and Cenlar FSB's claim, provided that they are asking for a portion of the money they paid inadvertently because of computer action.  See Jan.

Tr. at 55:17-56:3 (Kramer).  Further, J. Gallegos and L. Gallegos stated that they went in person "to the treasurer's office" and asked to pay their property taxes, but the "treasurer's office said: No you can't.  Citi and Cenlar have to pay them."  Jan. Tr. at 56:7-10 (Kramer).  Jan. Tr. at 55:9-16 (Kramer).  J. Gallegos and L. Gallegos stated that they consent to CitiMortgage, Inc. and Cenlar FSB asserting an unjust enrichment claim for $10,000.00 for taxes and insurance that CitiMortgage, Inc. and Cenlar FSB "gratuitously paid," but that they do not consent to "the word 'lien,'" because that is "just a step too far."  Jan. Tr. at 56:15-16 (Kramer).

Experian Information and Trans Union declined another opportunity to speak, see Jan. Tr. at 56:21-24 (Court, Taylor, Sheldon), so CitiMortgage, Inc. and Cenlar FSB replied, see Jan Tr. at 57:3 (Alonso).  CitiMortgage, Inc. and Cenlar FSB argued that their counterclaim, "as it is drafted and attached to our motion for leave, clearly states that we're seeking to recover under the theory of unjust enrichment," and that they are seeking to be paid through a "money judgment, or if a money judgment doesn't get paid, an equitable lien, which is fairly common practice from what I understand."  Jan Tr. at 57:4-11 (Alonso).  The Court indicated that it would take the Counterclaim Motion under advisement, because it is "too complicated for me to decide whether it's futile or not . . . [T]here [are] a lot of moving parts here."  Jan Tr. at 57:19-21 (Court).  J. Gallegos and L. Gallegos reiterated that they "consent to an unjust enrichment claim that doesn't have the word lien in it," noting that "I've never heard of an equitable lien, at least not in state court here in New Mexico."  Jan Tr. at 58:3-15 (Kramer).  The parties then discussed whether the Honorable Greg Fourratt, United States Magistrate Judge for the United States District Court for the District of New Mexico, or the Honorable Kirtan Khalsa, United States Magistrate Judge for the United States District Court for the District of New Mexico would act as a mediator, noting that it depends whether the mediation happens in Albuquerque or in Las Cruces, New Mexico.  See Jan Tr. at

61:18-64:18 (Sheldon, Court, Kramer, Taylor).  Just before the hearing concluded, the Court

observed that the parties prefer Judge Khalsa, so the Court will ask Judge Khalsa to see if she can

act as a mediator.  See Jan Tr. at 64:19-24 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests

the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The

sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a

court must accept as true all well-pled factual allegations in the complaint, view those allegations

in the light most favorable to the non-moving party, and draw all reasonable inferences in the

plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

(2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the

alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561

F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion,

we accept as true all well-pled factual allegations in a complaint and view these allegations in the

light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir.

2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels

and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

 "When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice,"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

 In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied

on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v.

Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions.  First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense – the courts handle these cases differently than other motions to dismiss.  See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan,

555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d at 1247.  Second, the defendant can raise

the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent

on the face of the complaint.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill,

J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the

failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion

may be disposed of under this rule.").  The defense of limitations is the affirmative defense that

the complaint's uncontroverted facts is most likely to establish.  See Wright & Miller supra at

§ 1277.  If the complaint sets forth dates that appear, in the first instance, to fall outside of the

statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See

Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v.

Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808

F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations

or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has

not clarified whether this assertion must be pled with supporting facts in the complaint or may be

merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir.

1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the

statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts

establishing an exception to the affirmative defense).  It appears that, from case law in several

Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-

dismiss stage – by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair,

Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691

n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not squarely addressed this practice,

the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27

F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING MANDAMUS

Mandamus -- Latin for "we command" -- is "[a] writ issued by a court to compel

performance of a particular act by a lower court or governmental officer or body."  Mandamus,

Black's Law Dictionary 1105 (10th ed. 2014).  Two distinct statutory provisions permit federal

courts to issue writs of mandamus, depending on the function a particular writ serves.  First, under

the All Writs Act, 28 U.S.C. § 1651, federal courts may issue writs of mandamus that are

"necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

principles of law."  28 U.S.C. § 1651(a).  Appellate courts have the "power in a proper case to

issue such writs" to constrain the trial courts' actions, but "[t]hese remedies should be resorted to

only where appeal is a clearly inadequate remedy," because "[a]s extraordinary remedies they are

reserved for really extraordinary cases."  Ex parte Fahey, 332 U.S. 258, 260 (1947).  See Cheney

v. U.S. Dist. Court for D.C., 542 U.S. 367, 380 (2004)("The common-law writ of mandamus

against a lower court is codified at 28 U.S.C. § 1651(a) . . . .").  "[O]nly exceptional circumstances

amounting to a 'judicial usurpation of power,' or a 'clear abuse of discretion'" justify a writ of

mandamus against a lower court.  Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367 at 381

(quoting Bankers Life and Casualty Co. v. Holland, 346 U.S. 379, 383 (1953)).  Consequently, a

petitioner seeking a writ of mandamus against a trial court judge must establish: (i) that the

petitioner has no other adequate means to obtain the relief desired, which "ensure[s] that the writ

will not be used as a substitute for the regular appeals process," (ii) that the petitioner's "right to

the issuance of the writ" is clear and indisputable, and (iii) "that the writ is appropriate under the

circumstances," which is a function of the issuing court's discretion.  Cheney v. U.S. Dist. Court

for D.C., 542 U.S. at 380-81.

The second statutory basis for mandamus relief is § 1361 of the Mandamus and Venue Act of 1962, Pub. L. No. 87-748, 76 Stat. 744, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. See generally Clark Byse & Joseph V. Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L. Rev. 308 (1967). "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Heckler v. Ringer, 466 U.S. 602, 616 (1984)(Rehnquist, J.). Mandamus is thus appropriate to compel agency action only where the agency "has failed to perform a nondiscretionary, ministerial duty." Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991)(Ebel, J.). See Estate of Smith v. Heckler, 747 F.2d 583, 591 (10th Cir. 1984)(McKay, J.)("[T]he general rule [is] that mandamus is appropriate where the person seeking the relief 'can show a duty owed to him by the government official to whom the writ is directed that is ministerial, clearly defined and peremptory.'" (quoting Carpet, Linoleum and Resilient Tile Layers, Local Union No. 419 v. Brown, 656 F.2d 564 (10th Cir. 1981)).

Once it has been shown that an agency has failed to perform a ministerial duty, courts have some discretion in fashioning mandamus relief. See Marathon Oil Co. v. Lujan, 937 F.2d at 500 ("Although the party seeking issuance of a writ of mandamus has a heavy burden of showing that the conditions are clearly met, the issuance of the writ is a matter of the issuing court's discretion." (citations omitted)). In Marathon Oil Co. v. Lujan, the Tenth Circuit affirmed a district court order granting mandamus relief insofar as the district court required the Department of the Interior to

complete administrative review of "an application for six oil shale mining patents within 30 days."
937 F.2d at 499.  The Tenth Circuit reversed the district court order, however, insofar as it directed
the Department of the Interior "to approve the application and issue the patents."  937 F.2d at 499.
The key distinction is that, "while the district court can compel the defendants to exercise their
discretion, it cannot dictate how that discretion is to be exercised."  Marathon Oil Co. v. Lujan,
937 F.2d at 501.  See Estate of Smith v. Heckler, 747 F.2d at 591 (holding that mandamus is an
appropriate remedy, because of the Secretary of Health and Human Services' duty to promulgate
nursing-home regulations even though the Medicaid Act [Pub. L. No. 111-3, 123 Stat. 91 (1935)]
"vests broad discretion in the Secretary as to how that duty is best accomplished").

## LAW REGARDING THE ANTI-INJUNCTION ACT

"The Anti-Injunction Act[, 28 U.S.C. § 2283,] provides that a federal court 'may not grant
an injunction to stay proceedings in a State court' except in three circumstances: 'as expressly
authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or
effectuate its judgments.'" Weyerhaeuser Co. v. Wyatt, 505 F.3d 1104, 1107 (10th Cir. 2007)
(quoting 28 U.S.C. § 2283).

> [T]he Supreme Court . . . explained the purpose of the [Anti-Injunction Act]. The
> law "is a necessary concomitant of the Framers' decision to authorize, and
> Congress' decision to implement, a dual system of federal and state courts." By
> prohibiting "frequent federal court intervention" in state court proceedings, the
> [Anti-Injunction Act] "forestalls . . . 'friction between the state and federal courts.'"

Weyerhaeuser Co. v. Wyatt, 505 F.3d at 1108 (citations omitted).  "[T]he [Anti-Injunction] Act is
an absolute prohibition against any injunction of any state-court proceedings, unless the injunction
falls within one of the three specifically defined exceptions in the Act." Vendo Co. v. Lektro–
Vend Corp., 433 U.S. 623, 630 (1977).  "[A]ny doubts as to the propriety of a federal injunction
against state court proceedings should be resolved in favor of permitting the state courts to proceed

in an orderly fashion to finally determine the controversy." Vendo Co. v. Lektro–Vend Corp., 433

U.S. at 630 (internal quotation marks omitted).

The Anti-Injunction Act applies to prohibit a federal court from enjoining the court or a

party in a state-court proceeding from prosecuting the suit, complying with, or enforcing state-

court orders. Section 2283's prohibition cannot be evaded by addressing the order to the parties or

prohibiting use of the results of a completed state proceeding.  See Atl. Coast Line R.R. Co. v.

Bhd. of Locomotive Eng'rs, 398 U.S. 281, 287 (1970).   "Proceedings in state courts should

normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief

from error, if any, through the state appellate courts and ultimately to the [Supreme] Court [of the

United States]."  Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. at 287.  The

Supreme Court has long held that the term "proceedings" in state court

> is comprehensive.  It includes all steps taken or which may be taken in the state
> court or by its officers from the institution to the close of the final process.  It applies
> to appellate as well as to original proceedings; and is independent of the doctrine
> of res judicata.  It applies alike to actions by the court and by its ministerial officers;
> applies not only to an execution issued on a judgment, but to any proceeding
> supplemental or ancillary taken with a view to making the suit or judgment
> effective.  The prohibition is applicable whether such supplementary or ancillary
> proceeding is taken in the court which rendered the judgment or in some other.  And
> it governs a privy to the state court proceeding . . . as well as the parties of record.
> Thus, the prohibition applies whatever the nature of the proceeding, unless the case
> presents facts which bring it within one of the recognized exceptions [to the Anti-
> Injunction Act].

Hill v. Martin, 296 U.S. 393, 403 (1935)(footnotes omitted).

## LAW REGARDING AMENDING THE PLEADINGS BEFORE TRIAL

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within

twenty-one days of serving it and within twenty-one days of the service of a response pleading.

See Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the

court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or

her pleading.  Rule 15(a) provides:

**(a)**   **Amendments Before Trial.**

**(1)**   **Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:

**(A)**   21 days serving it, or

**(B)**   if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

**(2)**   **Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

**(3)**   **Time to Respond.**  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the Court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Co-op., No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th

- 50 -

Cir. 2001).  See also In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

If a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s requirements, he or she must satisfy rule 16(b)(4)'s good-cause requirement.  See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th Cir. 2014)(Matheson, J.)("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard.").  Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "In practice, this standard requires the movant to show

the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'"  Gorsuch, Ltd.,

B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240.  The rule "focuses on the diligence of

the party seeking leave to modify the scheduling order to permit the proposed amendment."

Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M.

2010)(Browning, J.)("Properly construed, 'good cause' means that scheduling deadlines cannot be

met despite a party's diligent efforts.").  See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1209-11

(D.N.M. 2011)(Browning, J.)(same).

     The Court has previously stated that its rule 16(b) good-cause inquiry focuses on the

diligence of the party seeking to amend the scheduling order.  See Walker v. THI of N.M. at Hobbs

Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.);  Guidance Endodontics, LLC v.

Dentsply Int'l, Inc., No. 08-1101, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29, 2009)(Browning,

J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., Nos. 02-1146 and 03-1185, 2007 WL

2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.).  The United States District Court for the

District of South Carolina has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient
> standard contained in Rule 15(a).  Rule 16(b) does not focus on the bad faith of the
> movant, or the prejudice to the opposing party.  Rather, it focuses on the diligence
> of the party seeking leave to modify the scheduling order to permit the proposed
> amendment.  Properly construed, "good cause" means that scheduling deadlines
> cannot be met despite a party's diligent efforts.  In other words, this court may
> "modify the schedule on a showing of good cause if [the deadline] cannot be met
> despite the diligence of the party seeking the extension."  Carelessness is not
> compatible with a finding of diligence and offers no reason for a grant of relief.

Dilmar Oil Co., Inc. v. Federated Mut. Ins., 986 F. Supp. 959, 980 (D.S.C. 1997)(Currie, J.)

(citations omitted), aff'd, 129 F.3d 116 (4th Cir. 1997).  See Denmon v. Runyon, 151 F.R.D. 404,

407 (D. Kan. 1993)(O'Connor, J.)(affirming an order denying the plaintiff's motion to amend after

the deadline which the scheduling order established had passed and stating that, "[t]o establish

'good cause,' the party seeking to extend the deadline must establish that the scheduling order's deadline could not have been met with diligence").  Cf. SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1518-19 (10th Cir. 1990)(affirming, under rule 16(b), denial of a motion to amend an answer to include a compulsory counterclaim filed three months after the scheduling order deadline).

In In re Kirkland, 86 F.3d 172 (10th Cir. 1996), the Tenth Circuit dealt with the definition of "good cause" in the context of rule 4(j).[10]  The Tenth Circuit noted:

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

86 F.3d at 175 (emphasis omitted)(internal quotation marks omitted)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)).  The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"  In re Kirkland, 86 F.3d at 175.

Other courts within the Tenth Circuit have held that "the 'good cause' standard primarily considers the diligence of the party . . . seeking an extension[, who] must show that despite due

---

[10]The version of rule 4(j) that the Tenth Circuit discussed in In re Kirkland was the version in effect after the 1983 amendments to rule 4(j).  That version of rule 4(j) provided:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.  This subdivision shall not apply to service in a foreign country pursuant to subdivision (i) of this rule.

Act of Feb. 26, 1983, Pub. L. No. 97-462, 96 Stat. 2527.

diligence it could not have reasonably met the scheduled deadlines.  Carelessness is not compatible

with a finding of diligence and offers no reason for a grant of relief."  Pulsecard, Inc. v. Discover

Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan.1996)(Rushfelt, M.J.)(alterations in

original)(internal quotation marks omitted).  The Honorable Dale A. Kimball, now-Senior United

States District Judge for the District of Utah, concluded that "good cause" existed to amend his

scheduling order when he decided to permit the plaintiff's counsel to withdraw as counsel.  Kee v.

Fifth Third Bank, No. CIV 06-0602 DAK/PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008).

Judge Kimball reasoned: "[I]n light of the court's decision to permit [counsel] to withdraw . . . the

court has determined that good cause exists for amending the existing scheduling order."  Kee v.

Fifth Third Bank, 2008 WL 183384, at *1.

## RELEVANT NEW MEXICO LAW REGARDING ISSUE PRECLUSION ("COLLATERAL ESTOPPEL")

Under New Mexico law, "collateral estoppel, also called issue preclusion, prevents a party

from re-litigating 'ultimate facts or issues actually and necessarily decided in a prior suit.'"  Ullrich

v. Blanchard, 2007-NMCA-145, ¶ 19, 142 N.M. 835, 839, 171 P.3d 774, 778 (quoting Deflon v.

Sawyers, 2006-NMSC-025, ¶ 13, 137 P.3d 577, 582; Adams v. United Steelworkers of Am., AFL-

CIO, 1982-NMSC-014, ¶ 16, 640 P.2d 475, 479).   Accord Hartnett v. Papa John's Pizza USA,

Inc., 828 F. Supp. 2d 1278, 1286 (D.N.M. 2011)(Browning, J.).  For collateral estoppel to apply,

four elements must be met: (i) the party to be estopped was a party in the prior proceeding; (ii) the

cause of action in the case presently before the court is different from the cause of action in the

prior adjudication; (iii) the issue was actually litigated in the prior adjudication; and (iv) the issue

was necessarily determined in the prior litigation.  See Hernandez v. Parker, -- P.3d -- , 2022 WL

336419, at *2 (N.M. Ct. App. February 1, 2022)(quoting The Bank of New York v. Romero, 2016-

NMCA-091, ¶ 23, 382 P.3d 991, 998-99)).[11]  Accord Hartnett v. Papa John's Pizza USA, Inc., 828

F. Supp. 2d at 1286.  Additionally, "[t]o give rise to estoppel, the finding of ultimate facts in the

prior action must have been final."  Silva v. State, 1987-NMSC-107, ¶ 7, 745 P.2d 380, 382 (citing

C & H Constr. & Paving Co. v. Citizens Bank, 1979-NMCA-077, ¶ 27, 597 P.2d 1190, 1200 ("It

is well established that the doctrines of res judicata and collateral estoppel apply only to final

judgments.").  See also City of Santa Fe v. Velarde, 1977-NMSC-040, ¶ 9, 564 P.2d 1326, 1328

(asserting that application of the doctrines of res judicata or collateral estoppel requires a prior

final decision).  If the party invoking the doctrine establishes a prima facie case, then the burden

shifts to the party opposing collateral estoppel to show that he or she was not afforded a fair

opportunity to litigate the issue in the prior proceeding.  See Padilla v. Intel Corp., 1998-NMCA-

125, ¶ 4, 964 P.2d 862, 865; State v. Bishop, 1992-NMCA-034, ¶ 8, 832 P.2d 793, 795.[12]  Accord

Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286.

---

[11]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement of collateral estoppel's elements under New Mexico law in Hernandez v. Parker and The Bank of New York v. Romero, 2016-NMCA-091, ¶ 23, 382 P.3d 991, 998-99.  The Court bases its prediction on Silva v. State, 1987-NMSC-107, 745 P.2d 380, in which the Supreme Court of New Mexico identified the following elements of collateral estoppel under New Mexico law: "the parties in the second suit must be the same or in privity with the parties in the first suit," 1987-NMSC-107, ¶ 6, 745 P.2d at 382, and, where the causes of action in two cases are different, "the parties are precluded from relitigating only those ultimate issues and facts shown to have been actually and necessarily determined in the previous litigation," 1987-NMSC-107, ¶ 5, 745 P.2d at 382 (quotation marks omitted)(quoting City of Santa Fe v. Velarde, 1977-NMCA-040, ¶ 5, 564 P.2d 1326, 1328).  The Supreme Court of New Mexico identified the same collateral estoppel elements as the Court of Appeals of New Mexico and, therefore, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals' listing of those elements.

[12]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement regarding collateral estoppel burden-shifting, in Padilla v. Intel Corp. and State v. Bishop.  The Court bases its prediction on Silva v. State, 1987-NMSC-107, 745 P.2d 380, in which the Supreme Court of New Mexico stated: "This satisfied movant's burden of showing a prima facie case for summary judgment. . . .  It was then respondent's burden to show there was a factual issue as to a full and

Whether the doctrine of collateral estoppel should be applied is within the trial court's discretion, and the exercise of discretion is reviewed for an abuse of discretion on appeal.  See Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286; Shovelin, 1993-NMSC-015, ¶ 14, 850 P.2d at 1002.  Even when all the elements of collateral estoppel are present, the trial court may consider whether countervailing equities militate against application of the doctrine. See Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286; Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor, 1993-NMCA-008, ¶ 14, 848 P.2d 1086, 1091.  Collateral estoppel should be applied only where the judge determines that its application would not be fundamentally unfair.  See Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1286; Reeves v. Wimberly, 1988-NMCA-038, ¶ 14, 755 P.2d 75, 78.[13]

---

fair opportunity to litigate."  1987-NMSC-107, ¶ 8, 745 P.2d at 383.  The Tenth Circuit utilized the same quote from Padilla v. Intel Corp. to state the law regarding collateral estoppel burden-shifting in New Mexico.  See Salguero v. City of Clovis, 366 F.3d 1168, 1173 (10th Cir. 2004).

[13]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statements in Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor and Reeves v. Wimberly that a court should apply collateral estoppel only where the judge determines that its application would not be fundamentally unfair, and where equities do not militate against it.  See Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor, 1993-NMCA-008, ¶ 14, 848 P.2d at 1091; Reeves v. Wimberly, 1988-NMCA-038, ¶ 14, 755 P.2d at 78.  The Court bases its prediction on the Supreme Court of New Mexico's assertion in Silva v. State that, "[i]t is clear from the cited New Mexico authorities that, in deciding whether to apply the doctrine of collateral estoppel, the trial judge may determine that its application would be fundamentally unfair and would not further the aim of the doctrine," and therefore may decide not to apply the doctrine.  1987-NMSC-107, ¶ 7, 745 P.2d at 382.  The Supreme Court of New Mexico also stated: "A growing number of jurisdictions hold that, absent fundamental unfairness in a given case, the doctrine of collateral estoppel may be applied . . . ." 1987-NMSC-107, ¶ 7, 745 P.2d at 382.

**RELEVANT NEW MEXICO LAW REGARDING RES JUDICATA**

Under New Mexico law, res judicata, also known as claim preclusion, bars re-litigation of "the same claim between the same parties or their privies when the first litigation resulted in a final judgment on the merits." Deflon v. Sawyers, 2006-NMSC-025, ¶ 2, 137 P.3d at 579.  New Mexico law prescribes four elements for a party seeking to assert res judicata: "(i) the same parties or parties in privity; (ii) the identity of capacity or character of persons for or against whom the claim is made; (iii) the same subject matter; and (iv) the same cause of action in both suits." Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1285-86 (citing Apodaca v. AAA Gas Co., 2003-NMCA-085, ¶ 75, 73 P.3d 215, 238-39[14]).  Res judicata is a broad bar, precluding a party from bringing any claims which were, or which could have been raised in a prior proceeding finally determined on the merits. See Kirby v. Guardian Life Ins., 2010-NMSC-014, ¶ 61, 231 P.3d 87, 105.  To determine whether a prior suit, under res judicata, precludes a claim in a second suit, New Mexico courts will look to: "(i) the relatedness of the facts in time, space origin, or motivation; (ii) whether, taken together, the facts form a convenient unit for trial purposes; and (iii) whether the treatment of the facts as a single unit conforms to the parties' expectations or business understanding or usage." Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1285-86 (citing Bank of Santa Fe v. Marcy Plaza Assocs., 2002-NMCA-014, 131 N.M. 442, 40 P.3d 442). Additionally, res judicata bars a claim only where a party had a "full and fair opportunity to litigate

---

[14]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement of res judicata's elements in Apodaca v. AAA Gas Co., because of the Supreme Court of New Mexico's statement of the same elements in Silva v. State, that "Application of the doctrine of *res judicata* . . . depends upon identity of prior and subsequent actions in four respects: (1) parties or privies, (2) capacity or character of persons for or against whom the claim is made, (3) cause of action, and (4) subject matter." Silva v. State, 1987-NMSC-107, ¶ 5, 745 P.2d at 382.

issues arising out of that claim." Kirby v. Guardian Life Ins., 2010-NMSC-014, ¶ 61, 231 P.3d at 105.

### LAW REGARDING THE ROOKER-FELDMAN DOCTRINE

The Rooker-Feldman doctrine embodies the principle that federal district courts may not serve as courts of appeal for State courts. See Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.). Review of a State's highest court judgments is within the Supreme Court of the United States' exclusive jurisdiction. See D.C. Ct. App. v. Feldman, 460 U.S. 462, 476 (1983); Bolden v. City of Topeka, 441 F.3d 1129, 1140 (10th Cir. 2006). See also 28 U.S.C. § 1257 (establishing review by Supreme Court of final judgments of highest court of a state). The Rooker-Feldman doctrine bars a "federal action that tries to *modify or set aside* a state-court judgment because the state proceeding should not have led to that judgment." Mayotte v. U.S. Bank National Ass'n for Structured Asset Inv. Loan Trust Mortg. Pass-Through Certificates, Series 2006-4, 880 F.3d 1169, 1174 (10th Cir. 2018)(emphasis in original). A district court has no jurisdiction over a matter in which: "(i) a state-court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *38 (citing Guttman v. Khalsa, 446 F.3d 1027, 1032 (10th Cir. 2006)).

Although Rooker-Feldman, with its four elements, appears to be a straight-forward principle, the application of the doctrine can be complex. For example, a challenge to a state court judgment is "barred even if the claim forming the basis of the challenge was not raised in the state proceedings," yet "Rooker-Feldman does not bar a federal-court suit raising a claim previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply

contradict, the state-court judgment." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1141, 1144.  The Tenth Circuit has reconciled these principles by concluding that the scope of <u>Rooker-Feldman</u> is "confined to the cases of the kind . . . brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1142-43 (citing <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 282 (2005)).  Thus, an essential characteristic of a suit barred under <u>Rooker-Feldman</u> is that the "loser in state court invites [a] federal district court to overturn [a] state court judgment." <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. at 287 n.2.  Conversely, <u>Rooker-Feldman</u> does not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or judgment." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1145.[15]  Thus, where a plaintiff does not put the State court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject matter, or even the same claims, as those presented in the state-court action." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1139.[16]

_____

[15]The Court has previously discussed the relation of <u>Rooker-Feldman</u> and <u>Younger v. Harris</u>, 401 U.S. 37 (1971). <u>See</u> <u>F.D.I.C. v. Harger</u>, 778 F. Supp. 2d 1123, 1135 n.6 (D.N.M. 2011)(Browning, J.).  In brief, whereas <u>Rooker-Feldman</u> bars a federal district court from reviewing state court judgments which are final, <u>Younger v. Harris</u> "prevents the federal district court from interfering in an ongoing state proceeding." <u>F.D.I.C. v. Harger</u>, 778 F. Supp. 2d at 1135, n.6.  Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a state court judgment is final nor pray for relief from a state court judgment once it becomes final.  <u>See</u> <u>Martinez v. Martinez</u>, No. CIV 09-0281 JB/LFG, 2013 WL 3270488, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).

[16]The doctrine of res judicata may bar a complaint that <u>Rooker-Feldman</u> does not.  <u>Rooker-Feldman</u> is related to the principle that federal courts possess only original jurisdiction.  <u>See</u> <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. at 416 ("Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the [state court] judgment . . . .  To do so would be an exercise of appellate jurisdiction.  The jurisdiction possessed by the [federal] District Courts is strictly original."); <u>Bolden v. City of Topeka</u>, 441 F.3d at 1145 (discussing that, where <u>Rooker-Feldman</u> is not a bar, "[a] myriad of doctrines, including

The Tenth Circuit's application of the <u>Rooker-Feldman</u> doctrine elucidates the opaque distinction between claims that <u>Rooker-Feldman</u> bars, and those claims that allege the same cause of action asserted in the State court, but are not barred.  The Tenth Circuit provided an example of this distinction in a hypothetical child-custody case in <u>Bolden v. City of Topeka</u>.  <u>See</u> 441 F.3d at 1129.  The Tenth Circuit explained that a father, who lost custody of his child in a State court judgment, could not then bring suit in federal court alleging that the state court judgment was invalid.  <u>See</u> 441 F.3d at 1129.  The father would be barred even if his claims in federal court were different from those in State court; were the father, perhaps, to argue that the State court judgment deprived him of due process or was contrary to federal law on other grounds, <u>Rooker-Feldman</u> would bar such an action.  <u>Bolden v. City of Topeka</u>, 441 F.3d at 1129.  <u>Rooker-Feldman</u> would not, however, bar the father from seeking custody of his child in federal court, so long as the father's complaint did not raise any allegations regarding the State court judgment specifically. <u>Bolden v. City of Topeka,</u> 441 F.3d at 1145.

The Tenth Circuit in <u>Bolden v. City of Topeka</u> ruled that a district court was wrong to bar a plaintiff's suit under <u>Rooker-Feldman</u> where the plaintiff "did not seek to overturn the state-court judgment."  441 F.3d at 1138.  The City of Topeka notified the plaintiff in <u>Bolden v. City of Topeka</u> that several properties he owned failed to meet housing code regulations and thus would be demolished.  <u>See</u> 441 F.3d at 1131-32.  The plaintiff initially sought to enjoin the destruction of his buildings in State court, and the State court denied his request.  <u>See</u> 441 F.3d at 1131-32. The plaintiff then filed suit in federal district court, once again seeking to enjoin the destruction of

---

res judicata, would almost certainly bar the suit" which was brought after a state court judgment adverse to the plaintiff).  <u>See also</u> <u>Campbell v. City of Spencer</u>, 682 F.3d 1278, 1283 (10th Cir. 2012)("<u>Rooker-Feldman</u> does not . . . override or supplant preclusion doctrine.")(citing <u>Exxon Mobil v. Saudi Basic Indus. Corp.</u>, 544 U.S. at 282).

his buildings.  See 441 F.3d at 1131-32.  His federal suit did not address the validity of the state court judgment or argue that federal court should override, on any grounds, the State court judgment denying his requested injunction.  See 441 F.3d at 1132.  The district court dismissed his request for an injunction under Rooker-Feldman, but the Tenth Circuit concluded that the district court misapplied the doctrine.  See Bolden v. City of Topeka, 441 F.3d at 1132, 1138.  The Tenth Circuit focused on the plaintiff's claims in federal court being "identical to what they would have been had there been no state-court proceeding."  Bolden v. City of Topeka, 441 F.3d at 1138.  Because the plaintiff did not argue that the "judgment itself inflicted an injury," Rooker-Feldman did not bar the plaintiff's claims alleging violations against the city's action of destroying his buildings.  Bolden v. City of Topeka, 441 F.3d at 1138, 1145.  Rooker-Feldman did not apply, because the plaintiff's claims "would be identical even had there been no state court judgment."  Bolden v. City of Topeka, 441 F.3d at 1145.

Similarly, the Tenth Circuit has endorsed the logic of Nesses v. Shepard, 68 F.3d 1003 (7th Cir. 1995)( Posner, J.), wherein the United States Court of Appeals for the Seventh Circuit found that Rooker-Feldman does not apply to a party's claims that do not request relief from a State-court judgment.  See Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(unpublished)(quoting Nesses v. Shepard, 68 F.3d at 1005).  In Nesses v. Shepard, the plaintiff suffered several losses in State court before suing the lawyers and judges involved in those State court proceedings in federal court.  See 68 F.3d at 1004.  He "allege[d] a massive, tentacular conspiracy among the lawyers and the judges to engineer [his] defeat" in the state court suits.  Nesses v. Shepard, 68 F.3d at 1004.  The federal district court dismissed the federal case for want of jurisdiction on the basis of the Rooker-Feldman doctrine.  See Nesses v. Shepard, 68 F.3d at 1004.  On appeal, the Seventh Circuit

- 61 -

held that <u>Rooker-Feldman</u> did not apply.   <u>Nesses v. Shepard</u>, 68 F.3d at 1005. The Honorable

Richard Posner, United States Circuit Judge for the Seventh Circuit, explained:

> [The <u>Rooker-Feldman</u> doctrine] is not that broad. Were [a plaintiff] merely
> claiming that the decision of the state court was incorrect, even that it denied him
> some constitutional right, the doctrine would indeed bar his claim.  But if he claims,
> as he does, that people involved in the decision violated some independent right of
> his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated
> by politics, then he can, without being blocked by the *Rooker Feldman* doctrine,
> sue to vindicate that right and show as part of his claim for damages that the
> violation caused the decision to be adverse to him and thus did him harm.
> Otherwise there would be no federal remedy for a violation of federal rights
> whenever the violator so far succeeded in corrupting the state judicial process as to
> obtain a favorable judgment.

<u>Nesses v. Shepard</u>, 68 F.3d at 1005 (internal citation omitted).  Judge Posner distinguished the case

from one <u>Rooker-Feldman</u> bars by pointing out that, although the plaintiff "was in a sense attacking

the ruling by the state court," by asserting that he lost in state court because the "lawyers and the

judges [engineered the plaintiff's] defeat," the plaintiff was not "seeking to undo a remedial order

of some sort."  68 F.3d at 1005.

The Tenth Circuit has barred a plaintiff's due process claims against a city, under <u>Rooker-</u>

<u>Feldman</u>, where the alleged violations occurred because of a state court's order.  <u>See</u> <u>Campbell v.</u>

<u>City of Spencer</u>, 682 F.3d, 1278, 1284 (10th Cir. 2012).  In <u>Campbell v. City of Spencer</u>, a plaintiff

filed suit in federal court, alleging, among other claims, that the City of Spencer violated her due-

process and Eighth Amendment rights by seizing her horses and imposing an "excessive fine"

pursuant to a state court order.  682 F.3d at 1280.  The federal court dismissed her due-process

allegations, finding that <u>Rooker-Feldman</u> barred the claims.  682 F.3d at 1280.  The Tenth Circuit

agreed.  Because the plaintiff's "deprivation of property . . . allegedly without just compensation

or due process was the deprivation ordered by the state court . . . [her] claim [had] merit only if

the state court forfeiture order was unlawful on the record before the court."  682 F.3d at 1284.

The plaintiff's suit was a "direct attack on the state court's judgment because an element of [her] claim [was] that the judgment was wrongful." 682 F.3d at 1284. "The alleged constitutional wrong was the content of the judgment . . . not . . . some act by a defendant that led to the judgment." 682 F.3d at 1285. Thus, <u>Rooker-Feldman</u> barred the plaintiff's claims, because the harm the plaintiff alleged would not have occurred but-for the state court judgment. 682 F.3d at 1285-86.

Moreover, the Supreme Court has held that the <u>Rooker-Feldman</u> doctrine "has no application to judicial review of executive action, including determinations made by a state administrative agency." <u>Verizon Md., Inc. v. Public Servs.' Comm'n of Md.</u>, 535 U.S. at 644 n. 3. The Tenth Circuit held that the <u>Rooker-Feldman</u> doctrine does not apply to determinations made by a property valuations protest board, whose authority was defined under New Mexico statute. <u>See Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d 1202, 1206 (10th Cir. 2006). In so holding, the Tenth Circuit reasoned that "<u>Rooker-Feldman</u> does not apply to judicial review of state agency decisions." <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d at 1207-08.

### LAW REGARDING PRIOR EXCLUSIVE JURISDICTION

Under the prior exclusive jurisdiction doctrine, when "the same parties are involved in litigation that is *in rem* or *quasi in rem*, the court where the last suit was filed must yield jurisdiction." <u>Cassity v. Pitts</u>, 995 F.2d 1009, 1012 (10th Cir. 1993)(citing <u>Princess Lida of Thurn & Taxis v. Thompson</u>, 305 U.S. 456, 466 (1939)(emphasis in original). The prior exclusive jurisdiction doctrine applies "when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property." 13F Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3631 (3d ed.). <u>See Trial Law. Coll. v. Gerry Spences Trial Law. Coll. at Thunderhead Ranch</u>, 2020 WL 3256816, at *3 (D. Wyo. June 16, 2020)(Carson,

J.).   When parallel State and federal suits are "'in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation,'" subsequent courts should yield jurisdiction to the original court.  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 667 n.5 (10th Cir. 2020)(quoting Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466 (1939)).   In other words, "when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." Marshall v. Marshall, 547 U.S. 293, 311 (2006).

When applying the prior exclusive jurisdiction doctrine, courts look to "the nature of the jurisdiction asserted by conflicting courts, and the identity of the subject matter of the suits."  13F Charles Alan Wright & Arthur R. Miller, supra at § 3631.   The prior exclusive jurisdiction rule is based on principles of comity, but is often "referred to as a jurisdictional limitation."  13F Charles Alan Wright & Arthur R. Miller, supra at § 3631.   Chief Justice of the United States William Howard Taft explains the doctrine:

> As between two courts of concurrent and coordinate jurisdiction, the court which first obtains jurisdiction and constructive possession of property by filing the bill is entitled to retain it without interference and cannot be deprived of its right to do so, because it may not have obtained prior physical possession by its receiver of the property in dispute; but where the jurisdiction is not the same or concurrent, and the subject-matter in litigation in the one is not within the cognizance of the other, or there is no constructive possession of the property in dispute by the filing of a bill, it is the date of the actual possession of the receiver that determines the priority of jurisdiction.

Harkin v. Brundage, 276 U.S. 36, 43 (1928).   While the prior exclusive jurisdiction doctrine supports the federal system by helping to ensure that federal courts do not usurp authority from State courts, its origins predate judicial federalism.   See 13F Charles Alan Wright & Arthur R. Miller, supra at § 3631.    The doctrine's primary purpose is "to protect the jurisdiction of the court

that has acquired control over the property." <u>See</u> 13F Charles Alan Wright & Arthur R. Miller, <u>supra</u> at § 3631.

The prior exclusive jurisdiction rule is not a discretionary abstention rule, but a "'mandatory jurisdictional limitation.'" <u>Chapman v. Deutsche Bank Nat. Trust Co.</u>, 651 F.3d 1039, 1043 (9th Cir. 2011)(quoting <u>State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians</u>, 339 F.3d 804, 810 (9th Cir. 2003)).[17]  The United States Court of Appeals for the Ninth Circuit states that, when applying the doctrine, courts should "not 'exalt form over necessity,' but instead should 'look behind the form of the action to the gravamen of a complaint and the nature of the right sued on.'" <u>Chapman v. Deutsche Bank Nat. Trust Co.</u>, 651 F.3d at 1044 (quoting <u>State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians</u>, 339 F.3d at 810).  The doctrine

---

[17]Unlike the United States Court of Appeals for the Ninth Circuit, the Tenth Circuit has not yet stated definitively whether the prior exclusive jurisdiction doctrine is a discretionary abstention rule or a mandatory jurisdictional limitation.  Given the Supreme Court's statement that "where the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction," however, the Court concludes that the Tenth Circuit would agree that the prior exclusive jurisdiction doctrine is a mandatory jurisdictional rule rather than a discretionary abstention doctrine.  <u>See</u> <u>Kline v. Burke Constr. Co.</u>, 260 U.S. 226, 229 (1922)(" The converse of the rule is equally true, that where the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction."); 13F Charles Alan Wright & Arthur R. Miller, <u>supra</u> at § 3631 (noting that "an abundance of federal decisional law, including an impressive array of Supreme Court decisions, makes it clear that in all cases involving a specific piece of property, real or personal (including various forms of intangible property), the federal court's jurisdiction is qualified by" the prior exclusive jurisdiction doctrine); <u>United States v. Sid-Mars Restaurant and Lounge, Inc.</u>, 644 F.3d 270, 274-75 (5th Cir. 2011)(describing the "prior-exclusive-jurisdiction-rule," but recognizing that it does not necessarily apply to situation where "the United States is a party, and it asserts a claim of right to a piece of property that is subject to ongoing litigation in state court").  Moreover, the prior exclusive jurisdiction doctrine's purposes support that it is best understood as a mandatory jurisdictional limitation, albeit one that does not preclude courts from thwarting the United States' attempts to act defensively and to "mitigate the possible effect state court litigation might have on the government's rights, including avoidance of conflict with a later-filed federal lawsuit." <u>United States v. Sid-Mars Restaurant and Lounge, Inc.</u>, 644 F.3d at 275.  <u>See</u> <u>Leiter Minerals, Inc. v. United States</u>, 352 U.S. 220, 226-28 (1957).

typically applies when the action is "not '*strictly* in personam' -- that is, if the action is *in rem* or *quasi in rem*." Chapman v. Deutsche Bank Nat. Trust Co., 651 F.3d at 1044 (quoting State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians, 339 F.3d at 811)(emphasis in Chapman v. Deutsche Bank Nat. Trust Co. and in State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians). Accordingly, the doctrine applies when parallel State and federal proceedings "seek to 'determine interests in specific property as against the whole world'" (in rem), or where the parties' "'interest[s] in the property . . . serve[] as the basis of the jurisdiction'" for the parallel proceeding (quasi in rem). State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians, 339 F.3d at 811 (quoting Black's Law Dictionary 1245 (6th ed. 1990))(alternations omitted).

## LAW REGARDING THE FCRA

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). The FCRA addresses chief Congressional concerns, including the accuracy of consumer reports and problems associated with resolving disputed information. See S. Rep. No. 91-517 at 1 (1969). In enacting the FCRA, Congress "creat[ed] a system intended to give consumers a means to dispute -- and, ultimately, correct -- inaccurate information on their credit reports." Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004). The FCRA's purpose is "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 at 1 (1969).

### 1.    The FCRA Imposes Duties Upon Furnishers of Disputed Information When They Receive Notification of a Dispute from a Consumer Reporting Agency.

The FCRA also places certain duties upon furnishers of credit information. A furnisher of information is "an entity which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies." Fishback v. HSBC Retail Servs. Inc., 944

F. Supp. 2d 1098, 1107 (D.N.M. 2013)(Browning, J.)(quoting Jarrett v. Bank of Am., 421 F. Supp. 2d 1350, 1352 n.1 (D. Kan. 2006))(internal quotation marks omitted).  Section 1681s-2(a) requires that furnishers provide accurate information to CRAs.  See 15 U.S.C. § 1681s-2(a).  Section 1681s-2(b) imposes a duty on furnishers after receiving notice of a consumer dispute from a CRA to investigate and report incomplete and inaccurate information to them.  See DiMezza v. First USA Bank, 103 F. Supp. 2d 1296, 1299 (D.N.M. 2000)(Vazquez, J.).  Section 1681s-2(a) "exclusively limits enforcement of the accurate information provisions under § 1681s-2(a) to federal and state officers."  DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299.  Sections 1681n(c) and 1681o(b) provide a private right of action against CRAs and furnishers of credit information that do not comply with the FCRA willfully or negligently, absent an explicit exception.  DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299.

A consumer can also bring a private cause of action against the furnisher for violations of § 1681s-2(b).  See DiMezza v. First USA Bank, 103 F. Supp. 2d at 1299.  After a CRA notifies a furnisher of a consumer dispute regarding the completeness or accuracy of information that the furnisher previously provided, the furnisher is obligated to conduct an investigation with respect to the disputed information, review all relevant information the CRA provided, and report the results of the investigation to the CRA.  See 15 U.S.C. § 1681s-2(b)(1)(A)-(C).  If the investigation reveals that the information is incomplete or inaccurate, the furnisher must report those results to all other CRAs that compile and maintain files on consumers on a nationwide basis to which the furnisher supplied the information.  See 15 U.S.C. § 1681s-2(b)(1)(D).  The furnisher must modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.  See 15 U.S.C. § 1681s-2(b)(1)(E).  A consumer can bring a cause of action through §§ 1681n and 1681o based upon a furnisher's willful or negligent failure

to perform these duties after a CRA notifies the furnisher of a consumer dispute.  See DiMezza v. First USA Bank, 103 F. Supp. 2d at 1300.

"When the furnisher receives notice of a dispute from the credit reporting agency, it must perform the verification and correction duties described in [§] 1681s-2(b)."  Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1147 (10th Cir. 2012).  These duties do not arise until after a CRA notifies a furnisher of a dispute.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x 744, 751 (10th Cir. 2009)(unpublished).  Notice directly from a consumer does not give rise to these duties.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751.  When a consumer contacts a CRA to dispute information on a credit report, the CRA is obligated to contact the furnisher of the information.  See 15 U.S.C. § 1681i(a)(2).  "The FCRA does not require a CRA to tell a *consumer* when it notifies a *furnisher of information* about the consumer's dispute."  Lang v. TCF Nat'l Bank, 249 F. App'x 464, 466 (7th Cir. 2007)(unpublished)(emphases in original).  The consumer cannot recover under § 1681s-2(b) if they do not initiate the process for recovery by notifying a CRA of the dispute.  See Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147.

"Where a plaintiff has not alleged that CRAs were notified of disputed credit information, the Tenth Circuit has found that the plaintiff did not sufficiently allege that the furnishers of the disputed information had a duty under § 1681s-2(b)."  Fishback v. HSBC Retail Servs. Inc., 944 F. Supp. 2d at 1108 (citing Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147 (holding that a district court properly dismissed a plaintiff's FCRA claim because the plaintiff did not allege notification of the dispute to a CRA); Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751 (holding that plaintiffs failed to state a claim for relief under the FCRA because they alleged only that they notified a furnisher -- not a CRA -- of a dispute)).  In Pinson v. Equifax Credit Information

Services, the Tenth Circuit affirmed the district court's dismissal of the Pinsons' FCRA claim for failing to state a claim for relief, because the Pinsons alleged that they notified only the furnisher of the disputed information -- Capital One -- of their dispute, and not any CRAs.  See 316 F. App'x at 751.  The Pinsons notified a CRA in 2003 of one instance of reporting false or inaccurate information.  See Pinson v. Equifax Credit Info. Servs., No. CIV 06-0162 GKF/SAJ, 2008 WL 906222, at *3 (N.D. Okla. Mar. 31, 2008).  The district court did not consider the 2003 notification to the CRA in the Pinsons' complaint, because the Pinsons filed their cause of action in 2006, putting the notice outside of the two-year statute of limitations of § 1681p.  See 2008 WL 906222, at *3.  Because a furnisher's duties arise only after a CRA's notification of a dispute, and because the Pinsons' complaint did not allege that they notified a CRA within the statute of limitations, the Pinsons' complaint failed to state a claim under the FCRA.  See Pinson v. Equifax Credit Info. Servs., 316 F. App'x at 751.

In Sanders v. Mountain Am. Fed. Credit Union, the Sanders alleged that the defendant, Mountain America, incorrectly reported that the Sanders opened twelve new accounts and were liable for damages under the FCRA for the erroneous reporting.  See 689 F.3d at 1147.  The Tenth Circuit, in an opinion that the Honorable Terrence L. O'Brien, United States Circuit Judge for the Tenth Circuit, wrote, and Judges McKay and Kelly joined, affirmed the district court's conclusion that the Sanders did not have a claim under the FCRA, because they did not allege that they notified a CRA of the dispute with the credit information that Mountain America furnished.  See Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1147; Llewellyn v. Shearson Fin. Network, 622 F. Supp. 2d 1062, 1072-73 (D. Colo. 2009)(finding that a plaintiff failed to state a claim for a FCRA violation against a furnisher, because the plaintiff did not allege "that he notified a credit reporting agency of his dispute over [the furnisher]'s information, and that the credit reporting

agency supplied [the furnisher] with notice of that dispute").  As the plaintiffs in these cases had

not notified a CRA of the dispute, a CRA could not have notified the furnisher of the disputed

information to trigger the furnisher's duties under the FCRA.

The United States Court of Appeals for the Seventh Circuit, in an opinion that the

Honorable Ilana D. Rovner, United States Circuit Judge for the Seventh Circuit, wrote, and Judges

Wood and Williams joined, has held that a plaintiff sufficiently states a claim for a violation of the

FCRA against a furnisher where the plaintiff contacted a CRA regarding the dispute, although the

plaintiff did not allege that the CRA contacted the furnisher of the disputed information.  See Lang

v. TCF Nat'l Bank, 249 F. App'x 464, 466-67 (7th Cir. 2007)(unpublished).   Judge Rovner

concluded that the plaintiff's allegations were sufficient to provide notice of the claim to the

furnisher, TCF National Bank, because the plaintiff asserted that he told a CRA of the dispute, that

TCF Bank refused to investigate or correct the false report, and that TCF Bank violated the FCRA.

See Lang v. TCF Nat'l Bank, 249 F. App'x at 466.  Judge Rovner noted a practical reason for not

requiring the plaintiff to allege that a CRA notified the furnisher: the CRA is not required to notify

the consumer that it has contacted the furnisher, and, thus, "a consumer may not, at the time of

filing a complaint, be in a position to allege that notification."  Lang v. TCF Nat'l Bank, 249 F.

App'x at 466. Judge Rovner held that the plaintiff's "recovery under the FCRA is *plausible,* which

is all that notice pleading requires."  Lang v. TCF Nat'l Bank, 249 F. App'x at 467 (emphasis in

original).  See Huber v. Trans Union, LLC, No. CIV 11-0139, 2012 WL 3045686 at *3 (S.D. Ind.

July 25, 2012)(Barker, J.)("If a plaintiff alleges that she notified a CRA that she disputed specific

information . . . she need not also allege that the CRA notified the information furnisher of the

dispute because it is the CRAs obligation under the law to do so.").

2.      **Duty of a Furnisher to Accurately Report a Dispute Under Section 1681S2(B) of the FCRA.**

After the furnisher receives notice of a dispute from a CRA, § 1681s-2(b) requires the furnisher to report the results of its investigation into the dispute to the CRA and, "if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information." 15 U.S.C. § 1681s-2(b). "The purpose of § 1681s-2(b) is to require furnishers to investigate and verify that they are in fact reporting complete and accurate information to the CRAs after a consumer has objected to the information in his file." Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1164 (9th Cir. 2009). The Tenth Circuit has stated:

> [A]s several of our sister circuits have explained, the FCRA's requirement that furnishers of information correct "incomplete or inaccurate" information, 15 U.S.C. § 1681s-2(b)(1)(D), extends not only to false information, which "is clearly inaccurate," but to information provided "in such a manner as to create a materially misleading impression" as well.

Llewellyn v. Allstate Home Loans, Inc., 711 F.3d at 1186 (quoting Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 617 (6th Cir. 2012)). See Saunders v. Branch Banking & Trust Co., 526 F.3d at 148 ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression."); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 (holding that a credit report may be deemed "'incomplete or inaccurate' within the meaning of the FCRA 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions'" (quoting Sepulvado v. CSC Credit Servs., 158 F.3d 890, 895 (5th Cir. 1998))).

An accurate statement may be misleading if it can reasonably be interpreted in an inaccurate, adverse manner. See Pinner v. Schmidt, 805 F.2d 1258, 1262-63 (5th Cir.

1986)(finding that the statement "litigation pending" on a plaintiff's credit report could have been interpreted as indicating that a furnisher brought a suit against the plaintiff, when the reverse was accurate); Dalton v. Capital Assoc'd Indus., Inc., 257 F.3d 409, 415-16 (4th Cir. 2001)(finding a genuine issue of material fact existed regarding the accuracy of a plaintiff's credit report where a jury could reasonably interpret the report as indicating that the plaintiff was convicted of a felony, although the plaintiff had actually pled guilty to a misdemeanor).  In Pinner v. Schmidt, the United States Court of Appeals for the Fifth Circuit affirmed a jury verdict finding that a CRA had breached its statutory duty under the FCRA to follow reasonable procedures to assure the maximum possible accuracy of a consumer's credit report where "any person could easily have construed the notation 'Litigation Pending' as an indication that the plaintiff was being sued by [the furnisher], while the actual situation was the reverse." 805 F.2d at 1262.  The Fifth Circuit stated that "[i]t would have been a simple matter to prevent this ambiguity" particularly in light of the CRA's knowledge of the dispute.  805 F.2d at 1263.

In Dalton v. Capital Associated Industries, Inc., Richard Dalton alleged that a CRA inaccurately reported his criminal history, which included a guilty plea to a misdemeanor, by reporting: "Felony -- Third degree assault -- 1/26/94 -- Guilty -- 710 days suspended sentence, 20 days jail sentence, 2 years' probation."  257 F.3d at 415-16.  The United States Court of Appeals for the Fourth Circuit stated that a jury could reasonably conclude that "the report indicates that Dalton was guilty of a felony" and, therefore, "inaccuracy would be established because it is undisputed that Dalton pled guilty to a misdemeanor."  257 F.3d at 416.

The duty to report a dispute does not extend to meritless disputes, "because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading."  Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163.  Failing to report a bona fide dispute is materially

misleading, because it creates the impression that the consumer is financially responsible for a debt for which the consumer may not actually be responsible.  See Saunders v. Branch Banking & Trust Co., 526 F.3d at 149-50 ("[I]f a consumer has a meritorious dispute . . . the consumer's failure to pay the debt does not reflect financial irresponsibility.").  "It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)."  Saunders v. Branch Banking & Trust Co., 526 F.3d at 149-50.  If this duty were required for meritless disputes, a consumer could prevent a genuine debt from impairing the consumer's credit reputation by indefinitely disputing the debt.

Some courts have noted that whether credit information is materially misleading is a question for the fact finder.  See, e.g., Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 ("The consumer must still convince the finder of fact that the omission of the dispute was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect.'" (quoting Saunders v. Branch Banking & Trust Co., 526 F.3d at 150)); Krajewski v. Am. Honda Fin. Corp., 557 F. Supp. 2d 596, 615 (E.D. Pa. 2008)(finding that whether a credit report was accurate depended on the meaning of "repossession" as used in the report and, given the definitions of repossession, a reasonable jury could conclude that the CRA's reporting could be so misleading as to be inaccurate).

## LAW REGARDING THE NMUPA

The NMUPA provides private -- individual and class action -- remedies and civil penalties "for unfair, deceptive, or unconscionable trade practices."  Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507 JB/KBM, 2012 WL 1132414, at *19 (D.N.M. March 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins, 2010-NMSC-009, ¶ 22, 227 P.3d 73, 80)).  See N.M.S.A. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any

trade or commerce are unlawful."); N.M.S.A. § 57-12-10 (authorizing private suits); N.M.S.A.

§ 57-12-11 (authorizing the Attorney General of New Mexico to seek civil penalties).   In

construing the NMUPA, "courts to the extent possible will be guided by the interpretations given

by the federal trade commission and the federal courts."  N.M.S.A. § 57-12-4.

> The term ""unfair or deceptive trade practice'" covers
>
> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

N.M.S.A. § 57-12-2(D)(quotation for emphasis).  To succeed on an NMUPA claim of an unfair or

deceptive trade practice, the plaintiff most show four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading.  *Ashlock*[v. Sunwest Bank of Roswell, N.A.], [1988-NMSC-026, ¶ 4,] . . . 753 P.2d [346,] 347.  Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts."  *Id*.  Third, the conduct complained of must have occurred in the regular course of the represter's trade or commerce.  *Id*.  Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."  *Id*.

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d 1308, 1311.  "Generally

speaking, [this NMUPA provision] is designed to provide a remedy against misleading

identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 2007-

NMCA-100, ¶ 22, 166 P.3d 1091, 1096.[18]  "The gravamen of an unfair trade practice is a

---

[18]Here, the Court must look to how the Supreme Court of New Mexico, rather than the Court of Appeals of New Mexico, would resolve the case.  Federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict how the state's highest court would rule if presented with the same case.  See Wade v. EMCASCO

misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12. The Court has noted that, "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading," although "generally the question is a matter of fact." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1192-93 (reasoning that the Supreme Court of New Mexico would reach this conclusion). The Court has also concluded that a communication can mislead even if the representation is not false. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (concluding that the Supreme Court of New Mexico would reach this conclusion).

Unconscionable trade practices include:

---

Ins., 483 F.3d at 666. When making an Erie guess, a federal court should follow intermediate state-court decisions "unless other authority convinces us that the state supreme court would decide otherwise." Koch v. Koch Indus., Inc., 203 F.3d at 1230 (quoting Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir. 1984)). The Court predicts that the Supreme Court of New Mexico would agree with Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332, see infra, that the NMUPA provides a remedy against misleading, false, or deceptive statements associated with advertising and the sale of goods, based on the Court's read of the Supreme Court of New Mexico's opinion in Stevenson v. Louis Dreyfus Corp., stating that the NMUPA is modeled after the Uniform Deceptive Trade Practices Act, which "provides a private remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d at 1310-11 (citing N.M.S.A. § 57-12-1). The Court will, accordingly, apply New Mexico law as the Court of Appeals of New Mexico articulated that law in Lohman v. Daimler-Chrysler Corp. and Diversey Corp. v. Chem-Source Corp.

act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:

(1)     take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2)     result[] in a gross disparity between the value received by a person and the price paid.

N.M.S.A. § 57-12-2(E).   An unconscionable trade practice, accordingly, can be procedurally unconscionable, per § 57-12-2(E)(1), or substantively unconscionable, per § 57-12-2(E)(2).   See Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.").   The NMUPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits."   State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 34, 329 P.3d 658, 671.   "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."   Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08.   Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns."   Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907.   Substantive unconscionability arises where a contract is illegal, or where it "is grossly unreasonable and against our public policy under the circumstances," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31,

308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," State ex rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 670.

Under the NMUPA, the Attorney General of New Mexico is entitled to bring an action in New Mexico's name for NMUPA violations.  See N.M.S.A. § 57-12-8(A).  In such an action, the Attorney General may "petition the district court for temporary or permanent injunctive relief and restitution."  N.M.S.A. § 57-12-8(B).  Special penalties are available against persons who act willfully:

> In any action brought under Section 57-12-8 NMSA 1978, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by the Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per violation.

N.M.S.A. § 57-12-11.  "Willful conduct is the intentional doing of an act with knowledge that harm may result."  N.M. Civ. UJI 13-1827.[19]

_____

[19]The Court expects the Supreme Court of New Mexico to define the NMUPA's "willful" according to the New Mexico Civil Uniform Jury Instructions.  As discussed supra, the Court predicts that the Supreme Court of New Mexico would conclude that the New Mexico Civil Uniform Jury Instructions best defines New Mexico's understanding of "willful" in the punitive damages context.  The Court of Appeals of New Mexico has concluded that the NMUPA's civil penalties are punitive.  See Atherton v. Gopin, 2015-NMCA-003, ¶ 53, 340 P.3d at 641 (citing McLelland v. United Wis. Life Ins., 1999-NMCA-055, ¶ 10, 127 N.M. 303, 980 P.2d 86, 90).  The Court predicts that the Supreme Court of New Mexico would agree with Atherton v. Gopin.  In Hale v. Basin Motor Co., the Supreme Court of New Mexico concluded that multiplying civil penalties based on scienter creates punitive damages.  See 1990-NMSC-068, ¶ 20, 110 N.M. at 320.  The NMUPA does not multiply the otherwise applicable civil penalties for culpable defendants, but it increases the maximum penalty according to scienter.  Multiplying civil penalties differs from increasing maximum civil penalties only in the means of calculating penalties; both provision categories enhance penalties for culpable mental states and are likewise punitive.  The Court concludes, accordingly, that the Supreme Court of New Mexico would look to the New Mexico Civil Uniform Jury Instructions to understand "willful" in the NMUPA provision for

## LAW REGARDING THE FDCPA

The FDCPA regulates abusive practices of "debt collectors," and the statute includes a specific definition of that term. 15 U.S.C. § 1692a(6). A "debt collector" is an entity that uses interstate commerce or the mail to collect debts as its principal business, or that "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). A company collecting debts owed to itself, however, is not a "debt collector" unless it "uses any name other than [its] own which would indicate that a third person is collecting . . . such debt." 15 U.S.C. § 1692a(6). See 15 U.S.C. § 1692a(6)(F) (providing that a "debt collector" does not include persons collecting debts owed to themselves under an original obligation). "'[A] distinction between creditors and debt collectors is fundamental to the FDCPA, which does not regulate creditors' activities at all.'" Schmitt v. FMA Alliance, 398 F.3d 995, 998 (8th Cir. 2005)(quoting Randolph v. IMBS, Inc., 368 F.3d 726, 729 (7th Cir. 2004)). Cf. Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000)("Creditors -- as opposed to 'debt collectors' -- generally are not subject to the FDCPA.").

Thus, courts dismiss suits for failure to state a claim that are brought under the FDCPA against credit card companies or banks that extend credit and attempt to collect the unpaid debt. See, e.g., Lewis v. ACB Bus. Servs, Inc., 135 F.3d 389, 411 (6th Cir. 1998)(holding that a credit card company that sued a debtor in state court to collect debt could not be sued under FDCPA, because it "is primarily in the business of extending credit, which is not enough to turn an entity into a debt collector under the Act"); Montgomery v. Huntington Bank, 346 F.3d

---

enhanced civil penalties. Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d at 641 (reaching the same conclusion as the Court and using the N.M. Civ. UJI 13-1827 definition to define "willful" in the NMUPA).

693, 698-99 (6th Cir. 2003)(holding that bank, which was a consumer creditor of plaintiff, was not liable under the FDCPA, because it did not fall within the definition of debt collector and was expressly covered by creditor exceptions).  Further, "a creditor cannot be held vicariously liable under the FDCPA for abusive actions by independent collection agencies."  Duncan v. Citibank (S. Dakota), N.A., No. CIV. 06-0246 JB/KBM, 2006 WL 4063022, at *3 (D.N.M. June 30, 2006)(Browning, J.)(citing Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 108 (6th Cir. 1996)).   Other courts have dismissed cases brought against Citibank or its affiliates under the FDCPA for these reasons.  See, e.g., Doherty v. Citibank (South Dakota), N.A., 375 F. Supp. 2d 158, 162 (E.D.N.Y. 2005); Kloth v. Citibank (South Dakota), N.A., 33 F. Supp. 2d 115, 119 (D. Conn. 1998); Meads v. Citicorp Credit Servs, Inc., 686 F. Supp. 330, 333-34 (S.D. Ga. 1988)).

## ANALYSIS

First, Equifax Information, Experian Information, and Trans Union ask the Court to dismiss J. Gallegos and L. Gallegos' Complaint, because one of their six claims fails to state a claim upon which relief can be granted.  The Court will not dismiss the Complaint, nor will the Court dismiss the FCRA claim.  Second, the Court will not Order J. Gallegos and L. Gallegos to withdraw their State court sanctions motion, because the Anti-Injunction Act bars the Court from ordering it. Third, CitiMortgage, Inc. and Cenlar FSB may assert an unjust enrichment counterclaim against J. Gallegos and L. Gallegos, but may not assert an equitable lien counterclaim against J. Gallegos and L. Gallegos.

## I.   THE COURT WILL NOT DISMISS THE COMPLAINT OR THE FCRA CLAIM AGAINST EQUIFAX INFORMATION, EXPERIAN INFORMATION, AND TRANS UNION.

J. Gallegos and L. Gallegos assert six claims: (i) quiet title, seeking a declaration that J. Gallegos and L. Gallegos' mortgage is released to J. Gallegos and L. Gallegos, "subject only to

the existing valid mortgage lien held by the Secretary of Housing and Urban Development";
(ii) NMUPA violations; (iii) a FDCPA violation by Cenlar FSB; (iv) tortious debt collection
against CitiMortgage, Inc. and Cenlar; (v) FCRA violations by Equifax Information, Experian
Information, and Trans Union; and (vi) FCRA violations by CitiMortgage, Inc. and Cenlar FSB.
See Complaint ¶¶ 42-67, at 7-11.  Equifax Information, Experian Information, and Trans Union
ask the Court to dismiss the Complaint in its entirety, because J. Gallegos and L. Gallegos do not
plead an "inaccuracy" as part of their FCRA claims either under 15 U.S.C. §§ 1681e(b) and
1681i(a).  MTD at 1.  Equifax Information, Experian Information, and Trans Union take issue with
only one element of one of J. Gallegos and L. Gallegos' six claims.  See MTD at 1-10.  Because
Equifax Information, Experian Information, and Trans Union offer no argument on J. Gallegos
and L. Gallegos' five other claims, and the Court, on its own, sees no sound reason to dismiss the
entire Complaint sua sponte, the Court will not dismiss the entire Complaint.  Instead, the Court
will consider whether to dismiss J. Gallegos and L. Gallegos' fifth claim for Equifax Information,
Experian Information, and Trans Union's alleged FCRA violations.  See Complaint ¶¶ 57-60, at
9-10.

        The Court will dismiss J. Gallegos and L. Gallegos' FCRA claim against Equifax
Information, Experian Information, and Trans Union if J. Gallegos and L. Gallegos do not plead
sufficient factual content to allow "the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v.
Twombly, 550 U.S. at 556).  Rule 12(b)(6) requires "'more than a sheer possibility that a defendant
has acted unlawfully.'"  Nowell v. Medtronic Inc., 372 F. Supp. 3d at 1245 (quoting Ashcroft v.
Iqbal, 556 U.S. at 678).  J. Gallegos and L. Gallegos' contend that Equifax Information, Experian
Information, and Trans Union willfully or negligently violated 15 U.S.C. §§ 1681e(b) and 1681i(a)

by "fail[ing] to maintain reasonable procedures to ensure the maximum possible accuracy of the consumer credit information it reported concerning" J. Gallegos and L. Gallegos.  Complaint ¶ 57, at 9.

To succeed on an FCRA claim under 15 U.S.C. § 1681e(b), a plaintiff must show that: (i) the CRA did not follow reasonable procedures to assure the accuracy of its reports; (ii) the report in question was, in fact, inaccurate; (iii) the plaintiff suffered injury; and (iv) the CRA's failure to follow reasonable procedures caused the plaintiff's injury.  See Eller v. Trans Union, LLC, 739 F.3d 467, 473 (10th Cir. 2013).  A plaintiff's burden under 15 U.S.C. § 1681i(a) is "essentially the same" as his or her burden under 15 U.S.C. § 1681e(b) with one exception: a plaintiff also must prove that "they informed the CRA about the inaccuracy."  Wright v. Experian Info. Sols., Inc., 805 F.3d 1232, 1242 (10th Cir. 2015).  A reasonable investigation under 15 U.S.C. §§ 1681e(b) and 1681i(a) "does not require CRAs to resolve legal disputes about the validity of the underlying debts they report."  Wright v. Experian Info. Sols., Inc., 805 F.3d at 1242.

Here, the dispute is over the Brickhouse Order.  On the one hand, Equifax Information, Experian Information, and Trans Union argue that the Brickhouse Order raises a legal issue whether J. Gallegos and L. Gallegos' mortgage is valid.  See MTD at 7-9.  According to Equifax Information, Experian Information, and Trans Union, the Brickhouse Order is "silent about any impact on credit reporting," so their credit reporting is accurate, because choosing not to report the J. Gallegos and L. Gallegos' mortgage would require Equifax Information, Experian Information, and Trans Union to "decide a legal issue raised by the [Brickhouse] Order's silence."  MTD at 7. On the other hand, J. Gallegos and L. Gallegos argue that Equifax Information, Experian Information, and Trans Union reported a factual inaccuracy, because the Brickhouse Order "ordered that Citi did not have the authority to enforce [the] loan," so any "reporting of the debt

as to Citi and its servicer Cenlar was a factual inaccuracy on the Gallegos' credit reports."  MTD
Response at 9.

As pled, J. Gallegos and L. Gallegos state a claim upon which relief can be granted, because
they plausibly allege that Equifax Information, Experian Information, and Trans Union have
reported factually inaccurate information, namely that CitiMortgage, Inc. and Cenlar FSB can
collect on J. Gallegos and L. Gallegos' mortgage.  In relevant part, the Brickhouse Order states
that CitiMortgage, Inc. "is not a party entitled to enforce the Note," and "lacks the power and
ability to enforce the lost note."  Brickhouse Order at 1-2.  The parties agree that the Brickhouse
Order by itself does not extinguish J. Gallegos and L. Gallegos' debt.  See MTD Reply at 3; Tr. at
7:15-19 (Merar)(asserting that the Brickhouse Order states only that "Citi doesn't have standing
to enforce the note and to foreclose on it," and does not state that "the debt is extinguished or that
the plaintiffs are somehow no longer liable for the outstanding balance"); Complaint ¶ 10, at 2
(stating that "Defendant Secretary of Housing and Urban Development is the holder of a valid
mortgage on the Plaintiffs' home and is named as a Defendant in this case solely for purpose of
notice of the quiet title action"); Tr. at 14:1-7 (Fleming)(agreeing that the Brickhouse Order does
not extinguish their debt, and that the "actual holder" of the note can "come forward and report"
J. Gallegos and L. Gallegos' credit reports, collect the debt, and foreclose on the property).

While there can be no cognizable claim against Equifax Information, Experian
Information, and Trans Union for reporting information on the J. Gallegos and L. Gallegos' credit
reports that is facially or "patently" correct, Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876
(9th Cir. 2010), as pled, J. Gallegos and L. Gallegos' FCRA claim asserts that Equifax Information,
Experian Information, and Trans Union report that CitiMortgage, Inc. and Cenlar FSB can collect
on the mortgage, see Complaint ¶¶ 32-35, at 6.  See also Prianto v. Experian Info. Sols., Inc., No.

CIV 13-03461-TEH, 2014 WL 3381578, at *5 (N.D. Cal. July 10, 2014)(Henderson, J.)("Thus, Plaintiff's claim that Experian violated the FCRA by reporting the existence of the Heritage debt fails because Plaintiff does not dispute the debt's existence or its facial or patent accuracy."). Equifax Information, Experian Information, and Trans Union argue correctly that they have no obligation to resolve a legal dispute about the Brickhouse Order in their credit reporting. See MTD at 5-8; Wright v. Experian Info. Sols., Inc., 805 F.3d at 1242. To determine whether a consumer identifies a factual inaccuracy in his or her credit report that can give rise to an FCRA claim, the "'decisive inquiry' is whether the defendant credit bureau could have uncovered the inaccuracy 'if it had reasonably reinvestigated the matter.'" DeAndrade v. Trans Union LLC, 523 F.3d 61, 68 (1st Cir. 2008).

Equifax Information, Experian Information, and Trans Union assert that J. Gallegos and L. Gallegos' FCRA claim rests wholly on a differing interpretation of the Brickhouse Order, and that, as a result, for Equifax Information, Experian Information, and Trans Union to have reported information about the mortgage differently would have required Equifax Information, Experian Information, and Trans Union to agree with J. Gallegos and L. Gallegos' interpretation of the Brickhouse Order, which is a legal determination. See MTD at 4-9. If J. Gallegos and L. Gallegos had pled that Equifax Information, Experian Information, and Trans Union reported that J. Gallegos and L. Gallegos still had a mortgage at all, then Equifax Information, Experian Information, and Trans Union would be correct. Equifax Information, Experian Information, and Trans Union mischaracterize J. Gallegos and L. Gallegos' claim, however. As J. Gallegos and L. Gallegos contend in their MTD Response, Equifax Information, Experian Information, and Trans Union's "reporting of the debt as to Citi and its servicer Cenlar was a factual inaccuracy on the Gallegos' credit reports." MTD Response at 9. Equifax Information, Experian Information, and

Trans Union do not here provide any sound reason for the Court not to adopt the reasonable inference in J. Gallegos and L. Gallegos' favor that J. Gallegos and L. Gallegos' credit reports reflect a debt owed to CitiMortgage, Inc. or to Cenlar FSB.  See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. at 678.   Under the Complaint's allegations, therefore, a reasonable reinvestigation would have uncovered that CitiMortgage, Inc. cannot collect on J. Gallegos and L. Gallegos' mortgage -- a fact that the CRA defendants and CitiMortgage, Inc. admit.  See Tr. at 7:15-19 (Merar)(noting that the Brickhouse Order states that "Citi doesn't have standing to enforce the note and to foreclose on it," and does not state that "the debt is extinguished or that the plaintiffs are somehow no longer liable for the outstanding balance"); Tr. at 5:5-10 (Merar)(asserting that Judge Brickhouse concluded that CitiMortgage, Inc. "was not in possession of the note, and therefore, could not enforce the note" and that the Brickhouse Order "did not hold anything other than that fact"); Jan. Tr. at 5:10-14 (Smith)(stating that the Brickhouse Order means that CitiMortgage, Inc. "did not have standing arising from a lost note," does not "void the note," and does not "extinguish the note or the mortgage," but "simply dismissed the case based upon standing").  Consequently, because J. Gallegos and L. Gallegos plausibly allege all elements of an FCRA claim under 15 U.S.C. § 1681e(b), and because J. Gallegos and L. Gallegos plausibly allege that they informed the CRA defendants about the inaccuracy, J. Gallegos and L. Gallegos state a claim under 15 U.S.C. §§ 1681i(a) and 1681e(b) upon which relief can be granted.  See Complaint ¶¶ 32-35, at 6.  The Court, therefore, will deny the MTD.

## II.    THE COURT WILL NOT ORDER J. GALLEGOS AND L. GALLLEGOS TO WITHDRAW THEIR STATE COURT SANCTIONS MOTION.

CitiMortgage, Inc. and Cenlar FSB ask the Court, pursuant to the All Writs Act, 28 U.S.C. § 1651, to order J. Gallegos and L. Gallegos to withdraw their State court motion for sanctions in CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195, filed November 23,

2021, asserting that such an order is necessary to protect the Court's jurisdiction.  See MFA at 1.

The All Writs Act permits federal courts to "issue all writs necessary or appropriate in aid of their

respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).

The All Writs Act notwithstanding, a federal court "may not grant an injunction to stay proceedings

in a State court except as expressly authorized by an Act of Congress, or where necessary in aid

of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  Although the State

case is both a quasi in rem and in personam proceeding, the requested writ is not necessary in aid

of the Court's jurisdiction, because there is no quasi in rem parallel suit, because, even if the State

case is reopened, it presumably will be on personam grounds, because the Brickhouse Order settles

the quasi in rem matter.   Accordingly, the Court will deny the MFA.

The All Writs Act notwithstanding, the Anti-Injunction Act prevents federal courts from

enjoining State court proceedings except under three narrow circumstances: (i) when Congress

"expressly authorized" an injunction; (ii) the injunction is "necessary in aid of [the federal district

court's] jurisdiction"; and (iii) the injunction is necessary to "protect or effectuate" a previous

judgment in federal district court.  28 U.S.C. § 2283.  See Tooele Cnty. v. United States, 820 F.3d

1183, 1188 (10th Cir. 2016).   These three exceptions are "narrow and are not to be loosely

construed."  Tooele Cnty. v. United States, 820 F.3d at 1188 (citing Smith v. Bayer Corp., 564

U.S. 29 (2011)).  The second, "necessary in aid of jurisdiction," exception applies when: (i) both

the federal and State suits constitute in rem or quasi in rem proceedings; and (ii) the federal court

was the first to take possession of the property under dispute in the federal and State actions.[20]  28

---

[20]While, in the Tenth Circuit, the second exception applies only to in rem or quasi in rem actions, other United States Courts of Appeals apply it to in personam actions under extremely limited circumstances.  See In re Jimmy John's Overtime Litig., 877 F.3d 756, 764 (7th Cir. 2017)(explaining that the "necessary in aid of jurisdiction" exception "'empower[s] the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's

U.S.C. § 2283.  See Tooele Cnty. v. United States, 820 F.3d at 1188.  Because CitiMortgage, Inc.

and Cenlar FSB assert only that J. Gallegos and L. Gallegos' State court sanctions motion will

interfere with the Court's jurisdiction, the Court will address the second exception only.[21]  See

MFA at 1.

　　　To apply the second exception to the Anti-Injunction Act, "the court must decide whether

the two suits are either in rem or quasi in rem."  Tooele Cnty. v. United States, 820 F.3d at 1188.

"'An action in rem is one founded upon the rights in or to property.'"  Tooele Cnty. v. United

States, 820 F.3d at 1188 (quoting Housley v. Anaconda Co., 19 Utah 2d 124, 427 P.2d 390, 392

(1967)).  Thus, "in rem proceedings affect the interests of all persons in the property."  Tooele

Cnty. v. United States, 820 F.3d at 1188 (citing Archer v. United States, 268 F.2d 687, 690 (10th

Cir. 1959)).  "An action is quasi in rem when it affects the interests of only some persons in the

property."  Tooele Cnty. v. United States, 820 F.3d at 1188 (citing Archer v. United States, 268

---

jurisdiction nugatory'")(quoting Winkler v. Eli Lilly & Co., 101 F.3dd 1196, 1202 (7th Cir. 1996).
The Tenth Circuit has declined to expand the second exception beyond in rem and quasi in rem
actions.  See Tooele Cnty. v. United States, 820 F.3d at 1191.  The United States Court of Appeals
for the Seventh Circuit, for example, extends the second exception to situations that would impair
a court's adjudicatory competence, including over in personam actions.  See In re Jimmy John's
Overtime Litig., 877 F.3d at 764.  Here, even if the Anti-injunction Act applies to limited in
personam contexts, however, the J. Gallegos and L. Gallegos' State court sanctions motion does
not interfere with the Court's adjudicatory competence or its Court's September 27, 2021, Order.
See In re Jimmy John's Overtime Litig., 877 F.3d at 764.

　　　[21]Moreover, CitiMortgage, Inc. and Cenlar FSB do not point to any statute where Congress
expressly has authorized CitiMortgage, Inc. and Cenlar FSB's requested order.  Further, the Tenth
Circuit has not extended expressly the Quiet Title Act, 28 U.S.C. § 2409a, to this first Anti-
Injunction Act exception, and the Court also will not extend the Quiet Title Act to this first Anti-
Injunction Act exception, because the exceptions are to be treated narrowly.  See Tooele Cnty. v.
United States, 820 F.3d at 1188 ("And we decline to address the first exception -- whether the
Quiet Title Act is an 'expressly authorized' exception to the Anti-Injunction Act -- because this
issue was not presented to the federal district court.").  In addition, there is not yet a judgment in
this case with which the State court sanctions motion might interfere.  The only available
exception, therefore, is the second.

F.2d 687, 690 (10th Cir. 1959)).  See Restatement (Second) of Judgments § 6 cmt. a (Am. Law Inst. 1982).

This suit is, at least in part, an in rem or quasi in rem proceeding.  One of J. Gallegos and L. Gallegos' six claims is for quiet title.  See Complaint ¶¶ 42-45, at 7.  Quiet title actions are in rem or quasi in rem proceedings.  See Tooele Cnty. v. United States, 820 F.3d at 1188 (citing Chapman v. Deutsch Bank Nat'l Tr. Co., 302 P.3d 1103, 1106-07 (Nev. 2013); Enhancing the Marketability of Land: The Suit to Quiet Title, 68 Yale L.J. 1245, 1265 (1959)).  As pled, the State suit, CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195, is both a quasi in rem and an in personam action.  A foreclosure action involves quasi in rem jurisdiction, while a suit on a bond or promissory note involves in personam jurisdiction.  See Kepler v. Slade, 1995-NMSC-035, ¶ 8, 119 N.M. 802, 805, 896 P.2d 482, 485.  In the State suit, CitiMortgage, Inc. pleads a foreclosure action and a suit on the note.  See CitiMortgage, Inc v. Joey M. Gallegos, et al., No. D-202-CV-201804195, Complaint for Foreclosure, at 1-8.

Today, however, the State suit is no longer an in rem or quasi in rem suit, because the Brickhouse Order resolves the foreclosure matter and the suit on the note.  See Brickhouse Order at 1-2.  Judge Brickhouse is no longer being asked to adjudicate "the interests of only some persons in the property."  Tooele Cnty. v. United States, 820 F.3d at 1188.  See Jan. Tr. at 26:7-13 (Kramer)(noting that the "only matters right now pending before Judge Brickhouse are for an order to show cause on why they're continuing to collect and a motion for sanctions for lying to her"); Jan. Tr. at 52:5-12 (Alonso)(stating that CitiMortgage, Inc. and Cenlar FSB "are not asking the Court to revisit or overturn or otherwise alter the" Brickhouse Order).  Moreover, as CitiMortgage, Inc. and Cenlar FSB note, nobody appealed the Brickhouse Order, or filed a motion to alter, amend, or reconsider the Brickhouse Order, which means that Judge Brickhouse lacks jurisdiction to

amend it.  See N.M.R.A. 1-059(E); Jan. Tr. at 51:6-8 (Alonso).  Consequently, the State suit "does

not concern title to the contested rights of way at issue in the federal-court suit," and the Court

"cannot" grant an injunction "based solely on a 'close relationship' between the subject matter of

the federal and state suits."  Tooele Cnty. v. United States, 820 F.3d at 1189 (quoting Denver-

Greeley Valley Water Users Ass'n v. McNeil, 131 F.2d 67, 71 (10th Cir. 1942)).  See Negrete v.

Allianz Life Ins. Co., 523 F.3d 1091, 1101 (9th Cir.2008)("[T]he mere fact that the actions of a

state court might have some effect on the federal proceedings does not justify interference.").  The

Anti-Injunction Act, therefore, bars the Court from ordering J. Gallegos and L. Gallegos to

withdraw their State court sanctions motion.  Accordingly, the Court will deny the MFA.

### III.    CITIMORTGAGE, INC. AND CENLAR FSB MAY NOT ASSERT A COUNTERCLAIM FOR AN EQUITABLE LIEN, BUT MAY ASSERT A COUNTERCLAIM FOR UNJUST ENRICHMENT AGAINST J. GALLEGOS AND L. GALLEGOS.

CitiMortgage, Inc. and Cenlar FSB seek leave to assert two counterclaims against J.

Gallegos and L. Gallegos, see Counterclaim Motion at 1-2, namely, a claim for an equitable lien,

and a claim for unjust enrichment, see Defendants CitiMortgage, Inc.'s and Cenlar FSB's

Counterclaim, filed December 15, 2021 (Doc. 82-1)("Proposed Counterclaims").  As a threshold

matter, CitiMortgage, Inc. and Cenlar FSB seek leave to file counterclaims under rule 15(d).

Counterclaim Motion at 1-2.  Rule 15(d) of the Federal Rules of Civil Procedure states that a court

"may, on just terms, permit a party to serve a supplemental pleading setting out any transaction,

occurrence, or event that happened after the date of the pleading to be supplemented," even if the

"original pleading is defective in stating a claim or defense."  Fed. R. Civ. P. 15(d).  Rule 15(d)

governs filing supplemental pleadings for transactions, occurrences, or events that happened "*after

the date of the pleading to be supplemented*."  Fed. R. Civ. P. 15(d)(emphasis added).  See May v.

Segovia, 929 F.3d 1223, 1232 (10th Cir. 2019)(noting that a second amended complaint "was not

filed under Rule 15(d)," because its claims "did not arise from transactions or events that occurred after the First Amended Complaint"); Predator Intern., Inc., v. Gamo Outdoor USA, Inc., 793 F.3d 1177, 1186 (10th Cir. 2015)(stating that a motion conforms to rule 15(d) when the parties do not dispute that the supplemental claims are premised on transactions, occurrences, or events that happened after the date of the pleading to be supplemented).

Here, CitiMortgage, Inc. and Cenlar FSB did not include their equitable lien and unjust enrichment counterclaims in their Defendants' Answer and Affirmative Defenses, filed June 2, 2021 (Doc. 3)("Answer"). CitiMortgage, Inc. and Cenlar FSB's proposed counterclaims are for events that began in 2015. See Proposed Counterclaims ¶¶ 16-19, at 4-5. Moreover, rule 15(d) governs supplemental pleadings, and a standalone list of proposed counterclaims is not a pleading under rule 7(a). See Fed. R. Civ. P. 15(d). See also Rule 13(a)(noting that a counterclaim must be contained in a "pleading"). Therefore, because CitiMortgage, Inc. and Cenlar FSB now seek to amend their Answer by adding counterclaims, rule 15(a)(2) governs.[22] If twenty-one days have passed since a party served a pleading, the party nevertheless may amend their pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A court's decision whether to grant leave to amend under rule 15(a)(2) "focuses principally on prejudice." Sinclair Wyo. Refining Co. v. A & B Builders, Ltd., 989 F.3d 747, 777 (10th Cir. 2021). "Refusing leave

---

[22]CitiMortgage, Inc. and Cenlar FSB had until December 27, 2021, to move to amend their pleadings, because December 27, 2021, is three months after the September 27, 2021, scheduling conference. See Joint Status Report and Provisional Discovery Plan, filed July 12, 2021 (Doc. 11)("Generally speaking, the Parties agree to have until October 14, 2021, or 3 months from any scheduling conference, to move to amend the pleadings . . . in compliance with the requirements of Fed. R. Civ. P. 15(a)"); Order Adopting Joint Status Report and Provisional Discovery Plan, filed November 4, 2021 (Doc. 67). CitiMortgage, Inc. and Cenlar FSB filed their Counterclaim Motion on December 15, 2021. See Counterclaim Motion at 1. Accordingly, rule 15 governs. See Fed. R. Civ. P. 16.

to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993).

J. Gallegos and L. Gallegos do not object to CitiMortgage, Inc. and Cenlar FSB's proposed unjust enrichment claim. See Jan. Tr. at 55:8 (Kramer); id. at 56:12-16 (Kramer). As to CitiMortgage, Inc. and Cenlar FSB's proposed equitable lien claim, there is no dispute that CitiMortgage, Inc. and Cenlar FSB have not engaged in undue delay, imposed undue prejudice on J. Gallegos and L. Gallegos, acted in bad faith or with dilatory motive, and have not failed to cure deficiencies by amendments previously allowed. Rather, J. Gallegos and L. Gallegos oppose CitiMortgage, Inc. and Cenlar FSB's proposed equitable lien claim on the grounds that it is futile. See Counterclaim Response at 2. First, J. Gallegos and L. Gallegos argue that the proposed equitable lien claim will not survive a motion to dismiss for failure to state a claim, because it "asks for relief that the state court has already foreclosed on, and, as such, is barred by the doctrines of collateral estoppel and res judicata." Counterclaim Response at 2. Second, J. Gallegos and L. Gallegos assert that the proposed counterclaim will not survive a jurisdictional motion to dismiss, because "the state court has jurisdiction over the real property at issue." Counterclaim Response at 3.

New Mexico recognizes lien claims based in equity. See e.g., Computer One, Inc. v. Grisham & Lawless, P.A., 2008-NMSC-038, ¶ 12, 144 N.M. 424, 429, 188 P.3d 1175, 1179 (recognizing that principles of equity give rise to attorney charging liens). New Mexico recognizes two types of equitable liens, one based on agreement, and the other "constituting a 'remedial device, used to enforce the right to restitution in order to prevent unjust enrichment.'" Arena Resources, Inc. v. Obo, Inc., 2010-NMCA-061, ¶ 15, 138 N.M.483, 238 P.3d 357 (quoting Title

Guar. & Ins. Co. v. Campbell, 1987-NMCA-107, ¶ 25, 106 N.M. 272, 277, 742 P.2d 8, 13).[23]  "An equitable lien is a creature of equity, is based on the equitable doctrine of unjust enrichment, and is the right to have a fund or specific property applied to the payment of a particular debt." Caldwell v. Armstrong, 342 F.2d 485, 490 (10th Cir. 1965).  CitiMortgage, Inc. and Cenlar FSB's proposed equitable lien claim is based on a theory of unjust enrichment for $10,744.99 (as of October 28, 2021) for taxes and insurance that CitiMortgage, Inc. and Cenlar FSB paid on J. Gallegos and L. Gallegos' property since default.  See Proposed Counterclaim ¶¶ 16-19, at 4-5.

CitiMortgage, Inc. and Cenlar FSB's proposed equitable lien claim would be futile under rule 15(a)(2), because collateral estoppel and the Rooker- Feldman doctrine bar the claim.  New Mexico collateral estoppel law applies, because 28 U.S.C. § 1738 "requires a federal court to apply the law of the state rendering the judgment to determine collateral estoppel." Fed. Ins. Co. v. Gates Learjet Corp., 823 F.2d 383, 385 (10th Cir. 1987)(citing Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985)).  A federal court "cannot give greater preclusive effect to a state court judgment than would the state rendering the judgment." Fed. Ins. Co. v. Gates Learjet Corp., 823 F.2d at 385.  Under New Mexico law, collateral estoppel bars a claim when: (i) the party to be estopped was a party in the prior proceeding; (ii) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication; (iii) the issue was actually litigated in the prior adjudication; and (iv) the issue was necessarily determined in the prior

---

[23]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's decision in Arena Resources, Inc. v. Obo, Inc., 2010-NMCA-061, ¶ 15, 138 N.M.483, 238 P.3d 357, because Supreme Court of New Mexico recognizes equitable liens in other areas, other states recognize equitable liens as claims based in equity, see e.g., McIntyre v. Cox, 68 Wis. 2d 597, 601-02, 229 N.W.2d 613, 616 (Wis. 1975); Leyden v. Citicorp Indus. Bank, 782 P.2d 6, 9-10 (Colo. 1989)(en banc), and the Count can think of no sound reason that the Supreme Court of New Mexico would recognize attorney charging liens yet conclude that the New Mexico Court of Appeals' description of the two types is mistaken.

litigation.  See Hernandez v. Parker, -- P.3d -- , 2022 WL 336419, at *2 (N.M. Ct. App. February 1, 2022)(quoting The Bank of New York v. Romero, 2016-NMCA-091, ¶ 23, 382 P.3d 991, 998-99)).

Both an equitable lien claim and a foreclosure action involve determining whether J. Gallegos and L. Gallegos owe a debt to CitiMortgage, Inc. or Cenlar FSB.  See In re Donahue, 862, F.2d 259, 265-67 (10th Cir. 1988)(noting that equitable liens can be created judicially to secure payment on an existing debt); 51 Am. Jur. 2d Liens § 34 (stating that "for an equitable lien to exist, there must be a debt, duty, or obligation owing by one person to another"); Romero v. State, 1982-NMSC-028, ¶ 19, 97 N.M. 569, 574, 642 P.2d 172, 177 ("A foreclosure action is used to establish the priority of various liens; it does not necessarily litigate title to land.").  Although the title was not litigated actually in the State case, the existence of a debt that J. Gallegos and L. Gallegos owe to CitiMortgage, Inc. was litigated actually and determined.  See Brickhouse Order at 1-2 (concluding that CitiMortgage, Inc. "is not a party entitled to enforce the Note" and that CitiMortgage, Inc. "lacks the power and ability to enforce the lost note").  Were the Court to create an equitable lien in CitiMortgage, Inc. and Cenlar FSB's favor, it would have to be premised on an existing interest that CitiMortgage, Inc. and Cenlar FSB have in the contested property -- the lien would be to secure repayment.  The parties here agree, however, that the Brickhouse Order concludes that, although J. Gallegos and L. Gallegos still have debt, J. Gallegos and L. Gallegos do not owe a debt to CitiMortgage, Inc., because CitiMortgage, Inc. cannot collect on the note.  See MTD Reply at 3; Tr. at 7:15-19 (Merar)(asserting that the Brickhouse Order states only that "Citi doesn't have standing to enforce the note and to foreclose on it," and does not state that "the debt is extinguished or that the plaintiffs are somehow no longer liable for the outstanding balance"); Complaint ¶ 10, at 2 (stating that "Defendant Secretary of Housing and Urban

Development is the holder of a valid mortgage on the Plaintiffs' home and is named as a Defendant in this case solely for purpose of notice of the quiet title action"); Tr. at 14:1-7 (Fleming)(agreeing that the Brickhouse Order does not extinguish their debt, and that the "actual holder" of the note can "come forward and report" J. Gallegos and L. Gallegos' credit reports, collect the debt, and foreclose on the property). Moreover, collateral estoppel applies, because the Brickhouse Order does not determine an issue purely of law, but an issue bound up in the facts underlying J. Gallegos and L. Gallegos' mortgage. See Torres v. Vill. Of Capitan, 1978-NMSC-065, ¶ 18, 92 N.M. 64, 68, 582 P.2d 1277, 1281 (noting that collateral estoppel bars prelitigation of "a judge's ruling on a matter of law [that] is intertwined with the facts of a particular case" when the subsequent suit is "between the same parties or privies"). In addition, the parties in the proposed equitable lien counterclaim are the same as in the State case and the proposed cause of action is different from the State case. Consequently, all four collateral estoppel elements are met. The Brickhouse Order bars the proposed equitable lien claim.

Second, res judicata does not bar the proposed equitable lien claim. Under New Mexico law, res judicata bars re-litigation of "the same claim between the same parties or their privies when the first litigation resulted in a final judgment on the merits." Deflon v. Sawyers, 2006-NMSC-025, ¶ 2, 137 P.3d at 579. New Mexico law prescribes four elements for a party seeking to assert res judicata: "(i) the same parties or parties in privity; (ii) the identity of capacity or character of persons for or against whom the claim is made; (iii) the same subject matter; and (iv) the same cause of action in both suits." Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1285-86. Under New Mexico law, to determine if res judicata bars a different, subsequent claim, courts look to: (i) the relatedness of the facts in time, space origin, or motivation; (ii) whether, taken together, the facts form a convenient unit for trial purposes; and (iii) whether the treatment

of the facts as a single unit conforms to the parties' expectations or business understanding or usage.  See Bank of Santa Fe v. Marcy Plaza Assocs., 2002-NMCA-014, 131 N.M. 442, 40 P.3d 442); Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d at 1285-86.  Although the parties here are the same as in the State case, the claims here are different: an equitable lien claim would be to impose a lien for an existing debt; while a foreclosure action is to "establish the priority of various liens."  Romero v. State, 1982-NMSC-028, ¶ 19, 97 N.M. at 574, 642 P.2d at 177.  See In re Donahue, 862, F.2d 259, 265-67 (10th Cir. 1988)(noting that equitable liens can be created judicially to secure payment on an existing debt); 51 Am. Jur. 2d Liens § 34 (stating that "for an equitable lien to exist, there must be a debt, duty, or obligation owing by one person to another").  In addition, the facts underlying each claim are different, because, in the State case, CitiMortgage, Inc. sought to foreclose on J. Gallegos and L. Gallegos' home, whereas, in the proposed equitable lien claim, CitiMortgage, Inc. and Cenlar FSB hope to recover for taxes and insurance payments that CitiMortgage, Inc. and Cenlar FSB made on J. Gallegos and L. Gallegos' home, including for payments made since the Brickhouse Order.  See Proposed Counterclaim ¶¶ 16-19, at 4-5.  The two claims, therefore, "arose from different transactions," Kirby v. Guardian Life Ins. Co. of Am., 2010-NMSC-014, ¶¶ 63, 148 N.M. at 124, 231 P.3d at 105, and the equitable lien claim could "not have been raised" in the original State case, Kirby v. Guardian Life Ins. Co. of Am., 2010-NMSC-014, ¶¶ 61, 148 N.M. at 124, 231 P.3d at 105.  Res judicata, therefore, does not bar the proposed equitable lien claim.

Third, the prior exclusive jurisdiction doctrine does not bar the proposed equitable lien counterclaim.  Under the prior exclusive jurisdiction doctrine, when "the same parties are involved in litigation that is in rem or quasi in rem, the court where the last suit was filed must yield jurisdiction."  Cassity v. Pitts, 995 F.2d 1009, 1012 (10th Cir. 1993)(citing Princess Lida of Thurn

& Taxis v. Thompson, 305 U.S. 456, 466 (1939))(emphasis in original).  The prior exclusive jurisdiction doctrine applies "when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property."  13F Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3631 (3d ed.).  See Trial Law. Coll. v. Gerry Spences Trial Law. Coll. at Thunderhead Ranch, No. CIV 20-0080-JMC, 2020 WL 3256816, at *3 (D. Wyo. June 16, 2020)(Carson, J.).  When parallel State and federal suits are "'in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation,'" subsequent courts should yield jurisdiction to the original court.  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 667 n.5 (10th Cir. 2020)(quoting Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466 (1939)).  In other words, "when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*."  Marshall v. Marshall, 547 U.S. 293, 311 (2006)(emphasis in original).  Here, J. Gallegos and L. Gallegos contend that the prior exclusive jurisdiction doctrine bars the proposed equitable lien counterclaim.  See Counterclaim Response at 3.  As explained in Analysis § II, supra, however, this suit is, at least in part, an in rem or quasi in rem proceeding, and the State suit is no longer an in rem or quasi in rem suit, because the Brickhouse Order resolves the foreclosure matter and the suit on the note.  Moreover, as explained Analysis § II, supra, Judge Brickhouse today lacks jurisdiction to amend the Brickhouse Order.  See N.M.R.A. 1-059(E).  As a result, Judge Brickhouse in the State suit is not exercising in rem or quasi in rem jurisdiction over J. Gallegos and L. Gallegos' home.  The prior exclusive jurisdiction doctrine, therefore, does not bar the proposed equitable lien counterclaim.

Fourth, Rooker-Feldman bars the proposed equitable lien claim.  The Rooker-Feldman doctrine "precludes 'cases brought by state-court losers complaining of injuries caused by state-

court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" Tal v. Hogan, 453 F.3d 1244, 1255-56 (10th Cir. 2006)(quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).  "Thus, the Rooker-Feldman doctrine prevents 'a party losing in state court . . . from seeking what in substance would be appellate review of [a] state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'"  Tal v. Hogan, 453 F.3d at 1256 (quoting Johnson v. De Grandy, 512 U.S. 997, 1005-06 (1994)). CitiMortgage, Inc. and Cenlar FSB contend that Rooker-Feldman does not bar the proposed counterclaim, because the Court "has jurisdiction over this entire case, a condition initiated when Plaintiffs chose to file this lawsuit."  Counterclaim Reply at 3.  CitiMortgage, Inc. and Cenlar FSB's argument is unavailing and does not address Rooker-Feldman's role, because the Court cannot have jurisdiction over a claim that the Rooker-Feldman doctrine bars.  See Mo's Express, LLC v. Sopkin, 441 F.3d 1229, 1234 (10th Cir. 2006)(stating that Rooker-Feldman is not a constitutional requirement but nevertheless is a jurisdictional bar); Carmona v. Carmona, 603 F.3d 1041, 1050 (9th Cir. 2010)(noting that Rooker-Feldman stands for the principle that "federal district courts do not have jurisdiction to hear de facto appeals from state court judgments").  The proposed equitable lien counterclaim in effect asks the Court to revisit Judge Brickhouse's conclusion in the Brickhouse Order.  As explained above, imposing an equitable lien would need to be premised on an existing duty or obligation that J. Gallegos and L. Gallegos owe to CitiMortgage, Inc., but the Brickhouse Order concludes that J. Gallegos and L. Gallegos owe CitiMortgage, Inc. no such duty, because CitiMortgage, Inc. "is not a party entitled to enforce the Note," and "lacks the power and ability to enforce the lost note."  Brickhouse Order at 1-2.  The Court could not grant CitiMortgage, Inc. and Cenlar FSB an equitable lien without revising the

Brickhouse Order.  Rooker-Feldman, therefore, bars CitiMortgage, Inc. and Cenlar FSB's proposed equitable lien claim.  Accordingly, permitting CitiMortgage, Inc. and Cenlar FSB to amend their Answer to add an equitable lien claim against J. Gallegos and L. Gallegos would be futile under rule 15(a)(2).  See Fed. R. Civ. P. 15(a)(2).

**IT IS ORDERED** that: (i) the requests in the Defendants Equifax Information Services LCC, Experian Information Solutions Inc., and Trans Union's LLC's Motion to Dismiss Plaintiffs' Complaint and Supporting Memorandum of Law, filed October 28, 2021 (Doc. 62), are denied; (ii) the requests in the Defendant CitiMortgage, Inc's and Cenlar FSB's Motion for Abatement and Brief in Support, filed December 3, 2021 (Doc. 78), are denied; and (iii) Defendants CitiMortgage, Inc.'s and Cenlar FSB's Opposed Motion for Leave to File Counterclaim, filed December 15, 2021 (Doc. 82), is granted as to the unjust enrichment claim and denied as to the equitable lien claim.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Cassie Marie Fleming
New Mexico Legal Aid
Albuquerque, New Mexico

-- and --

David C. Kramer
Law Office of David C. Kramer, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Sam David Smith
Gabriella Alonso
Bradley Arant Boult Cummings, LLP
Houston, Texas

*Attorneys for Defendants CitiMortgage, Inc. and Cenlar FSB*

Fred J. Federici
   Acting United States Attorney
Manuel Lucero
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for Defendant Secretary of Housing and Urban Development*

Patricia Williams
Wiggins, Williams, & Wiggins
Albuquerque, New Mexico

-- and --

Adam Theodore Hill
Seyfarth Shaw, LLP
Chicago, Illinois

-- and --

Courtney Sophie Stieber
Seyfarth Shaw, LLP
New York, New York

-- and --

Lakai C. Vinson
Seyfarth Shaw, LLP
Charlotte, North Carolina

*Attorneys for Defendant Equifax Information Services, LLC*

Charles J. Vigil
Rodey, Dickason, Sloan, Akin, & Robb, P.A.
Albuquerque, New Mexico

-- and --

Angela M. Taylor
Jones Day
Irvine, California

*Attorneys for Defendant Experian Information Solutions, Inc.*

Paul W. Sheldon
Quilling, Selander, Lownds, Winslett and Moser, P.C.
Plano, Texas

-- and --

Michael Adam Merar
Seyfarth Shaw LLP
Houston, Texas

*Attorney for Defendant Trans Union, LLC*